Phillips Petroleum Co. *v.* Millette, et al.

May 3, 1954

No. 38942 63 Adv. S. 43 72 So. 2d 176

*Laub, Adams, Forman & Truly,* Natchez, for appellant.

*L. A. Whittington, R. L. Netterville, Berger & Callon,* Natchez, for appellees.

4

APPELLANT IN REPLY.

*Tom P. Caldwell, M. M. Roberts, Joe A. Thompson,* Hattiesburg, Amici Curiae.

*Brunini, Everett, Grantham & Quin,* Vicksburg; *Earl A. Brown, Charles B. Wallace, R. T. Wilkinson, Jr., A. E. Aikman, Jack E. Earnest,* Dallas, Texas, Amici Curiae.

*M. J. Peterson,* Jackson, Amicus Curiae.

*Watkins & Eager,* Jackson; *David Gross,* Laurel, Amici Curiae.

*Wells, Thomas & Wells,* Jackson, Amicus Curiae.

HALL, J.

This is the second appearance of this case in this Court. On the original appeal we had for consideration the sufficiency of the bill of complaint as stating a cause of action as against a demurrer, and we reversed the action of the chancellor in sustaining a demurrer to the bill and remanded the case for trial on one issue, viz., the liability of appellant for drainage of oil underlying appellees' land through wells owned and operated by it on adjoining land. See Millette v. Phillips Petroleum Company, 209 Miss. 687, 48 So. 2d 344. On that appeal we settled the law governing the trial upon remand. On the trial the chancellor awarded a judgment for drainage from appellees' land in the amount of $12,500.00 from which this appeal is prosecuted.

The principal point now argued by appellant, and the only point as to which there is any disagreement among us, is that the trial court erred in awarding any damages to appellees because of a finding by him that there was not a sufficient quantity of oil underlying the Millette land to justify the drilling of an offset well thereon. Specifically it is argued that Phillips would not be liable for drainage from appellees' land unless there was a sufficient quantity of oil thereunder to require a prudent operator to drill an offset well. We think this question was settled on the former appeal and we adhere to what was there said and to make our position clear we shall quote excerpts therefrom and summarize some portions thereof. It must be borne in mind that we are here dealing with a case where the oil company holds a lease on

the Millette land and has failed and refused to develop the same by drilling but is draining the oil from its subsurface through a well or wells owned and operated by the company on adjoining land.

In the former opinion we held (1) that the Millettes are not entitled to a cancellation of the lease on their land for failure to drill an offset well because ''The subject of offset wells is expressly provided for in the lease'' which of course supersedes any implied covenant as to offset drilling, and (2) that nevertheless ''The equitable duty, existing as well under implication, to conserve the mineral resources of lessors or to refrain from depletory acts survives unimpaired. * * * Such an obligation gains equitable recognition when substantial drainage is caused by the lessee himself. This responsibility is separable from a duty to drill offset wells, and an express covenant which absolves the lessee from this method of development does not relieve the lessee of liability for substantial drainage by him.'' Numerous authorities were cited and a quotation given from one of them to support the above pronouncement, after which we said ''We hold therefore that the bill states a cause for equitable relief by way of compensation for oil drained by lessee from lands leased to it by appellants.'' It seems crystal clear that we have already held as the law of this case that appellant is liable by way of compensation for oil drained by it from the land of appellees, at least where such drainage is substantial. And we may divert at this point to say that the lowest estimate of the value of the oil so drained, according to the witnesses for appellees, was $105,000.00 ▇▇ ▇ According to the lease the appellees were entitled to a royalty of one-eighth of the oil ''produced and saved from said land.'' It does not limit their royalty to one-eighth of the oil produced and saved from said land *through wells drilled on said land,* but obligates appellant to pay them the royalty on the oil produced and saved from said land regardless of how

it may be produced or where it may be drawn to the surface. The chancellor, in fixing the amount of royalty to which appellees are entitled, evidently scaled down the value of the drainage to $100,000.00 since he allowed recovery at one-eighth of that amount. It could hardly be seriously contended that this amount of drainage was not substantial.

Reverting to appellant's principal contention as hereinabove stated, the former opinion did not state and did not hold that to authorize a recovery of compensation for drainage there must be a showing that the amount of oil underlying appellees' land must be of such quantity that a prudent operator would drill a well thereon. ██ On the contrary, it pointed out that the duty to drill offset wells, as expressly stipulated and limited in the lease, is separable from the implied covenant to compensate for drainage and that the latter survives unimpaired. ██ Cases were cited in the opinion which hold that the so-called "prudent operator" rule has no application to a state of facts such as here presented, and we shall presently refer to some of them. The "prudent operator" rule has its place in those cases involving the duty to drill an offset well under an implied covenant where not expressly provided for in an oil and gas lease, and it is usually inserted in leases where the duty to drill offset wells is spelled out in the lease, such as the lease in the present case. But notwithstanding the fact that the rule has no place in a suit for recovery of compensation for drainage by a common lessee from one tract of land through a well drilled on an adjoining tract, the duty to drill offset wells and the duty to compensate for drainage being entirely separate, some courts have extended the rule to apply to suits for drainage. We decline to follow the rule as laid down by such courts. It is contrary to every concept of equity and justice to hold that a lessee may drill on adjoining land and through such a well drain dry the land on which it refuses to drill and

thereby deplete the resources of its lessor and enrich itself to that extent without the expenditure of one dime in developing the lessor's land and then refuse to pay the lessor the royalty for his oil which it has taken from him. It is not only contrary to equity and justice but is contrary to the express royalty provision in the lease here involved that appellant would pay the one-eighth royalty on the oil "produced and saved from said land." It is wholly beside the point to argue that appellant might have to pay to the lessor of the adjoining land a one-eighth royalty on all the oil which is produced from the well located on his land. Assuming, but without deciding such to be true, and assuming, but without deciding, that appellant might thereby have to pay a double royalty on a part of the oil produced from the well located on the adjoining land, the appellant is certainly in no position to complain of our holding, since it has saved unto itself the cost of drilling on appellees' land, and that saving is considerably more than the additional royalty which it might be required to pay.

Appellant's position is entitled to scant consideration in a court of equity. It refused to drill a well on appellees' land, contending that no oil could be produced from it. Thereupon appellees requested a cancellation of the lease so that it might undertake to induce some other operator to drill. This request was refused. Then appellees offered appellant a substantial consideration for cancellation of the lease, which it refused. Its position was and is that it had the right to prevent drilling on appellees' land and at the same time drain the oil underlying it without expense to itself and without compensating by way of royalty for the oil so drained. The obligation was upon appellant as lessee not to deplete the resources of its lessor. It violated that obligation and duty and claims that it is entitled to do so with impunity. Appellees were the owners in place of the oil beneath their land and were entitled to have it remain in place and not

drained away by their lessee without compensation. Our conservation law, Chapter 117, Laws of 1932, abolished at least in part the rule of capture which existed in this State under the common law. Griffith v. Gulf Refining Co., 215 Miss. 15, 25, 60 So. 2d 518 and 61 So. 2d 306. By amendment to the conservation law, Chapter 256, Laws of 1948, the public policy of the State was declared to be, among other things, "to safeguard, protect and enforce the co-equal and correlative rights of owners in a common source or pool of oil and gas to the end that each such owner in a common pool or source of supply of oil and gas may obtain his just and equitable share of production therefrom." Appellant's position is contrary to this declared public policy of Mississippi. It contends that appellees have no rights in this common pool under their land. What we said in Griffith v. Gulf Refining Co., supra, is particularly applicable here: "To all intents and purposes, they have built a fence around the lands in which appellants are interested. Neither production nor utilization of gas in which they have an interest can be had by appellants. On the contrary, appellees have taken it for their own use and have paid nothing therefor. It is unthinkable that the 90 acres can be utilized, as alleged by the complainants in this case, and its royalty owners receive nothing while the owners of the 160 acres receive all the benefits. On account of the fact that the well is evidently draining the 90 acre tract and that the owners of such acreage are thereby contributing to the production, actually the owners of the 160 acres must be getting more than they are entitled to, and this at a time when those on the 90 acre part of the unit are receiving nothing."

We turn now to some of the authorities from other jurisdictions which sustain our view on the point under consideration. In Blair v. Clear Creek Oil & Gas Co., 148 Ark. 301, 230 S. W. 286, 19 A. L. R. 430, the Supreme Court of Arkansas quoted with approval from Carper v.

United Fuel Co., 78 W. Va. 433, 89 S. E. 12, L. R. A. 1917 A, 171, and concluded with its own view as follows: " 'To say the lessor intended to permit the oil and gas in his land to be withdrawn from it otherwise than through wells drilled on it under the lease, and thus to let it go to other persons, for nothing, as an incident of his procurement of a small money rental for two, five, or ten years, would be inconsistent with reason, and contrary to the legal principles governing the relation of landlord and tenant or licensor and licensee. For the rental reserved, he is neither selling his oil or gas, nor relinquishing his ownership thereof, nor consenting to severance or abstraction thereof. He expects it to remain in the land until the rental period ends, whether it ceases by the drilling of a well or expiration of the term. Nor can it be doubted that the lessee contemplated the same result. Neither could have intended that he should take out the mineral through wells on other lands. The words of his lease contemplate his extraction of the oil and gas through wells to be drilled by him on the land, and so emphatically deny any such intent on his part. The rental is for delay, not destruction. If, by the negligence or misfeasance of a tenant, the demised property is materially injured, he is liable for the resultant damages, and the landlord may recover the amount thereof from him within the term, notwithstanding he has paid the rent or is bound to pay it. Moses v. Old Dominion Iron & Nail Works Co., 75 Va. 95, 102. If a tenant commit waste, an action lies against him. The landlord is not limited to his rent as compensation. In these cases there need not be an express covenant against waste, or an express agreement to pay the resulting damages. They are implied, if not expressed.'

"The contract is a lease of the land for the purpose of drilling for oil and gas for the period of time designated therein, and the lessee has a vested right to the possession of the land to the extent reasonably necessary to

perform the terms of the agreement on his part. Therefore there is an implied covenant on the part of the lessee to protect the lessor against drainage, and in default thereof the lessor may recover damages.

"We think this view is supported by the authorities cited below, and, in any event, that it is in accord with the better reasoning on the question. J. M. Guffey Petroleum Co. v. Jeff Chaison Townsite Co., 48 Tex. Civ. App. 555, 107 S. W. 609; Powers v. Bridgeport Oil Co., 238 Ill. 397, 87 N. E. 381; Kleppner v. Lemon, 176 Pa. 502, 35 Atl. 109, 18 Mor. Min. Rep. 404; Culbertson v. Iola Portland Cement Co., 87 Kan. 529, 125 Pac. 81, Ann. Cas. 1914A, 610; Harris v. Ohio Oil Co., 57 Ohio 118, 48 N. E. 502, 19 Mor. Min. Rep. 157; Kelley v. Ohio Oil Co., 57 Ohio St. 317, 39 L. R. A. 765, 63 Am. St. Rep. 721, 49 N. E. 399; Kellar v. Craig, 61 C. C. A. 366, 126 Fed. 630; and Thornton, Oil & Gas, 3d Ed., Vol. 1, Par. 109, and Vol. 2, Par. 882."

Following the report of this case in 19 A. L. R. there is an annotation beginning on page 437, and after numerous cases are reviewed it is said on page 443: "The foregoing rule requiring the lessor to show in effect that as an ordinary business proposition common prudence requires the lessee to drill offset wells has been applied in cases where the wells upon adjoining premises are operated by a stranger to the lease. If such wells are operated by the lessee, it would seem clear that, at least, he would be required to account to the lessor for the latter's share of the oil secured through the adjoining wells."

In the former opinion in this case we cited R. R. Bush Oil Co. v. Beverly-Lincoln Land Co., 69 Cal. App. 2d 246, 158 P. 2d 754, and quoted therefrom only a portion of a quotation therein contained from Geary v. Adams Oil & Gas Co., 31 F. Supp. 830. It has been suggested in conference that the Bush case is from an inferior appellate court, viz., the District Court of Appeal of California. That decision was founded, however, not only on numer-

ous authorities from other states, but also on a prior decision of the Supreme Court of California in the case of Hartman Ranch Co. v. Associated Oil Co., 10 Cal. 2d 232, 73 P. 2d 1163, and it was subsequently cited with approval by the Supreme Court of California in Federal Oil Co. v. Brower, 224 P. 2d 4. As supporting our holding we quote further from the Bush case as follows: ''In Kleppner v. Lemon, 1900, 197 Pa. 430, 47 A. 353, the defendant was the lessee of plaintiff's land and of the adjoining tract of Stotler. In May, 1895, defendant brought in a well on the Stotler tract, 157 feet from the line of plaintiff's land. When defendant began to sink that well, plaintiff requested defendant to place it further from his line since it might drain the oil from his land; and, after it had come in a good well, plaintiff requested defendant to sink a well on his land adjoining the Stotler property. Defendant refused to comply with either request. In August, 1895, the Stotler well produced 2,358 barrels of oil, but dropped to only 379 barrels in August, 1896, when the oil was substantially exhausted. The well did drain oil from plaintiff's land. He was therefore allowed damages equivalent to the royalty on the oil that was drained from his land. See opinion modifying judgment in Kleppner v. Lemon, 1901, 198 Pa. 483, 48 A. 483. The opinion of the trial judge is incorporated in the court's opinion, 47 A. 353. It is there pointed out that 'If he (defendant) designedly placed the Stotler well so near plaintiff's land as to drain it, and thus save the expense of sinking a well on plaintiff's land, it was bad faith, and a manifest, intentional injury to plaintiff. It was taking his oil without paying the royalty.' ▆▆ In a later Pennsylvania case (Barnard v. Monongahela Natural Gas Co., 1907, 216 Pa. 362, 65 A. 801, 803), the court said a lessee 'cannot take advantage of the fact that he has leases on adjoining farms so as to fraudulently deprive either of his lessors of his royalty or annual gas rental.'

"This problem was considered in Hughes v. Busseyville Oil & Gas Co., 1918, 180 Ky. 545, 203 S. W. 515, 518. Defendant had leases on adjacent lands. It had drilled on plaintiff's land within the specified time all the wells required under the lease. The court held there was no obligation to drill other wells in so far as development of the property was concerned but that the express covenant in the lease did not relate to drainage; that 'it would be a manifest injustice' to the lessor if the lessee 'were permitted to stand upon the terms of his contract,' and 'at the same time destroy the life and substance of it by permanently taking' through operations on adjoining land the income which the lessor had the right to enjoy. This case is summarized by our Supreme Court and cited with approval on this point in Hartman Ranch Co. v. Associated Oil Co., supra, 10 Cal. 2d at page 240, 73 P. 2d 1163. See, also, Carper v. United Fuel Gas Co., 1916, 78 W. Va. 433, 439, 89 S. E. 12, L. R. A. 1917A, 171, and Indian Territory Illuminating Oil Co. v. Haynes Drilling Co., 1937, 180 Okl. 419, 69 P. 2d 624, 636.

██ "From these authorities we conclude there is an implied obligation on the part of an oil and gas lessee to refrain from taking any affirmative course of action which will result in draining a substantial quantity of the oil and gas from the lessor's property and producing the same through the lessee's well on adjacent premises belonging to a different lessor. For a breach of this obligation the lessee is liable and is accountable for the royalty on the portion of the oil and gas which he drains from beneath the leased premises.

"Appellant earnestly contends that it is not liable for the drainage of respondent's land through its Zanetti No. 1 well, because the evidence does not establish that an ordinarily prudent operator would have drilled an offset well on respondent's property. Appellant's proposition is generally applicable where the drainage well is drilled by a third person, for obviously a lessee should

not be required, in the absence of an express provision in the lease, to drill an offset well to protect his lessor's land from drainage caused by one over whom he has no control unless an ordinarily prudent operator would drill such a well. That, however, is not the problem we have here. The drainage well in this case was drilled by the appellant. By appellant's affirmative course of conduct respondent is losing its oil and gas and the royalty thereon. It is not a question of whether a prudent operator should drill an offset well to protect his lessor against drainage caused by the acts of some third person but rather whether the lessee itself may drain the oil and gas from its lessor's land through a well on adjacent property without paying royalty to the owner of the drained land.''

We are impressed with and adopt the soundness of the reasoning in the Bush case notwithstanding the fact that some other jurisdictions have adopted a contrary view. Appellant relies in part on a decision of a Court of Civil Appeals of Texas in the case of Hutchins v. Humble Oil & Refining Co., 161 S. W. 2d 571, and it has been suggested in our conference that we have heretofore adopted the policy of following the Texas courts in cases involving oil and gas law. A typical case in which we declined to follow the Texas decisions is Griffith v. Gulf Refining Co., supra, wherein we said that we will follow them only if we are satisfied of the soundness of the reasoning by which they are supported. As a matter of fact Hutchins lost his case on the facts in the lower court and much that is said in the opinion of the Court of Civil Appeals therein is pure dictum, not necessary for the decision, and, in our opinion is not supported by the weight of authority elsewhere nor by sound reasoning.

In Hartman Ranch Co. v. Associated Oil Co., supra, the Supreme Court of California reviewed numerous cases, and said: ''Where express covenants'' (such as the limited covenant in the case at bar with reference to

the drilling of offset wells) ''do not cover completely all phases of the lessee's obligation in regard to exploration, development, and protection, implied covenants may co-exist with express covenants. Since the consideration for such leases is entirely or in large part the oil royalty payments to be made to the lessor, such covenants must be implied to protect the lessor and carry out the purpose of the lease. * * * In the instant case the drainage of the Hartman property in possession of defendant, Associated Oil Company, is alleged to arise from the operations of said defendant on the adjoining Lloyd property to the south. We need not decide herein whether the express covenant requiring 10 wells would exclude an implied covenant generally to drill further wells to protect from drainage, due to drilling by other operators than defendant. It certainly should not be held to have been within the contemplation of the parties that one who is in possession of the Hartman leasehold, and who, as we shall hereinafter discuss, has assumed the obligations of the Hartman lease, should by its own affirmative operations on adjoining land drain oil from beneath the Hartman property. The express covenant cannot be construed as an authorization for so doing.''

In Ramsey v. Carter Oil Co., 74 F. Supp. 481, the District Court for the Eastern District of Illinois said: ''To permit defendant to direct developments in the manner adapted only to the promotion of his gain and effectually to the impoverishment of the lessor's estate in oil and gas cannot in reason be deemed as even remotely contemplated by either party at the inception of the lease. Jennings v. Southern Carbon Co., 73 W. Va. 215, 80 S. E. 368, 19 A. L. R. 438. Daughetee v. Ohio Oil Co., supra (263 Ill. 518, 105 N. E. 308). It is not a question of whether oil can otherwise be taken from the soil. Plaintiffs own the oil and they have a right to have it kept in place and to be removed only by methods which will not deprive them of it. Any conversion of the oil by the

lessee by driving it away or otherwise is a clear invasion of plaintiffs' rights." The above case was affirmed on appeal, 172 F. 2d 622, and certiorari denied 93 L. Ed. 1757.

In Carper v. United Fuel Gas Co., 78 W. Va. 433, 89 S. E. 12, L. R. A. 1917A, 171, it is said: "To say the lessor intended to permit the oil and gas in his land to be withdrawn from it otherwise than through wells drilled on it under the lease, and thus to let it go to other persons, for nothing, as an incident of his procurement of a small money rental for two, five, or ten years, would be inconsistent with reason, and contrary to the legal principles governing the relation of landlord and tenant or licensor and licensee. For the rental reserved, he is neither selling his oil or gas, nor relinquishing his ownership thereof, nor consenting to severance or abstraction thereof. He expects it to remain in the land until the rental period ends, whether it ceases by the drilling of a well or expiration of the term. Nor can it be doubted that the lessee contemplated the same result. Neither could have intended that he should take out the mineral through wells on other land. The words of his lease contemplate his extraction of the oil and gas through wells to be drilled by him on the land, and so emphatically deny any such intent on his part. The rental is for delay, not destruction. If, by the negligence or misfeasance of a tenant, the demised property is materially injured, he is liable for the resultant damages, and the landlord may recover the amount thereof from him within the term, notwithstanding he has paid the rent or is bound to pay it. Moses v. Old Dominion Iron Co., 75 Va. 95, 102. If a tenant commit waste, an action lies against him. The landlord is not limited to his rent as compensation. In these cases, there need not be an express covenant against waste, nor an express agreement to pay the resulting damages. They are implied if not expressed."

In Culbertson v. Iola Portland Cement Co., 87 Kan. 529, 125 P. 81, Ann. Cas. 1914A, 610, the Supreme Court of Kansas said: "Appellants cannot escape liability for the gas extracted from appellee's land through the wells sunk by them on the adjoining land. In Thornton on Oil and Gas, Sec. 101, it is said that: 'A lessee must act in good faith in the operation of the leased premises. He cannot, under the guise of ownership of the adjoining premises, drain the lands he has leased by sinking wells on such premises, under the claim of a right to do so, and not put down a sufficient number of wells on the leased territory as will protect it from the wells operated on such adjoining territory, when the lessor, at least, receives his compensation by a royalty on or a part of the oil produced, or by a rental of so much per producing well.' Since the number of wells to be drilled on the land was not specified, there was an implied obligation on appellants to fully develop the land and put down as many wells as were necessary to secure to appellee his proportionate share of the pool of gas. Kleppner v. Lemon, 176 Pa. 502, 35 Atl. 109; Thornton on Oil and Gas, Sec. 91. According to the findings, appellants failed to develop the land in such a way as to give appellee his proportionate share of the gas produced from the pool, and that to have done so would have required the sinking of at least another well. Having failed in this respect, the appellee is entitled to recover his share of the gas actually taken from the land, without regard to which side of the line the wells through which it was taken were sunk."

In the cases from which we have quoted and in the original opinion in this case numerous other authorities are cited which support our holding. To quote from all of them would prolong this opinion to undue lengths. The rule which we adopt is that the so-called "prudent operator" test has no place in a suit of this nature. According to the evidence for appellees the appellant

has drained from their land between $105,000.00 and $147,000.00 worth of oil. This amount is substantial and that is all that is required to authorize a recovery for appellant's wrongful act. Appellant's proof is that it would have cost about $70,000.00 to have drilled and completed a producing well on the Millette land. These figures bring the case close to a decision that a prudent operator would have drilled it, but we pretermit such a decision on that point since it is our view that appellant is liable regardless of the "prudent operator" rule. The proof is ample to support a decree for the amount awarded by the chancellor, and his decree is accordingly affirmed.

Affirmed.

*Roberds, P. J.*, and *Lee, Kyle* and *Arrington, JJ.*, concur. *McGehee, C. J.*, took no part.

———

ETHRIDGE, J., dissenting.

I cannot agree with a requirement that an oil lessee must drill a protection well where it would have to do so at an economic loss, and where the land in question does not contain oil in paying quantities. A doctrine of absolute liability for all drainage by adjoining wells is repugnant to a principle basic in the entire development of oil and gas law. Moreover, I cannot see how appellees have been damaged when they have lost nothing of value recoverable at a profit.

The effect of the controlling opinion is to hold an oil lessee of two adjoining tracts absolutely liable for all drainage from one tract by its well on the other, even though the drained tract has such a marginal and small quantity of oil under it that an offset well could not be drilled on it at a profit. The prudent-operator test concerning protection of a lessor from drainage is abrogated by the majority opinion where the same lessee owns both

tracts, although it applies where there are different lessees. Yet there is no sound reason for the distinction, except where fraud exists, and there is no proof of that here. An oil and gas lease is executed for the mutual benefit of the parties, but here that mutuality of benefit is not the test. The controlling opinion is departing in my view from the majority rule elsewhere, and adopting an approach indicated largely by dicta in a small minority of cases. And pertinent in this respect is the danger that this departure from the prudent-operator test may well forecast a handicap to the future development of petroleum reserves in the State. Such a drastic change from precedent should be made by the legislature and not by the Court.

My views are directed toward two principal points: (1) The original Millette decision in 1950 did not decide the present issue; and (2) the prudent-operator test should be applicable, and is in accord with the great weight of authority.

This case was first before this Court in 1950 in Millette v. Phillips Petroleum Company, 209 Miss. 687, 48 So. 2d 344. The Millettes sued Phillips for cancellation of their lease and for damages for drainage of oil from beneath their lands. The defendant's general demurrer was sustained, and complainants appealed. On appeal the case was reversed and remanded. There was an express covenant in the lease requiring offset wells where there is a well on adjacent lands within 150 feet of the leased premises, if a "prudent operator" would drill the offset well. Hence it was held that this express covenant precluded an implied duty to drill offset wells. However, the Court reversed and remanded the case for the reason that the bill was said to state a cause of action for equitable relief by way of compensation for oil drained by lessee from lands leased to it by complainants. It was said that there is an implied covenant that the lessee will not impair the value of the lease and will use *"reasonable care"* to prevent drainage, and that the implied obli-

gation has been extended to include "a duty to drill offset wells *if practicable and profitable.*" This obligation "gains equitable recognition when *substantial* drainage is caused by the lessee himself." This duty is "separable from a duty to drill offset wells," and the "lessee is liable for *substantial* drainage by him." Hence the Court concluded "that the bill states a cause for equitable relief by way of compensation for oil drained by lessee from lands leased by appellants." But in order to determine what the Court there decided, it is necessary to know what the bill charged with reference to recoverable drainage of oil on appellee's lands. I here refer to Cause No. 37584 and the record in the original Millette case. The amended bill as submitted on the first appeal was plainly based upon a failure to perform the implied covenants to protect the lands from drainage.

With reference to the quantity of oil under complainants' land, the bill specifically charged that "a well drilled on complainants' land . . . would result in production of oil and gas in paying quantities;" and that defendant and "any prudent operator" knew that a well could be drilled on complainants' lands "as a producer in paying quantities." The bill further charged that more than three years had elapsed since it was known that "complainants' lands were in a producing area and if drilled would produce oil and gas in paying quantities." It averred that defendant had violated its obligation "to reasonably develop the lands of complainant after it had been demonstrated and shown that said lands were in a reasonably productive area."

These quotations from the amended bill of complaint, which was considered by the Court on the original appeal, make it manifest that the Court, when it held that the bill stated a cause of action, was holding that the cause of action was based on the affirmative facts averred in the bill *that there were substantial quantities of oil under complainants' land and that production could be obtained thereon in paying quantities.* Hence,

so far as the first Millette case is a precedent, its decision must be limited as stated above. So it is manifest, in my opinion, that the Court there did not pass upon the instant question of whether liability for drainage exists if production cannot be obtained on the leased lands in paying quantities. That question is now open for decision under the express finding of the chancellor, to the effect that there was not sufficient oil under the Millettes' land to justify a prudent operator drilling a well on it.

With reference to the quantum of damages allowed appellees against appellant, $12,500, there was a conflict in the evidence as to the amount of oil drained from appellants' premises, and the chancellor apparently undertook to apply the royalty rule. Although the evidence was rather weak to support appellees' contention that there was any oil at all under their lands, we cannot say that he was manifestly wrong on the facts, in view of the conflicting testimony of the geologists.

The chancery court found that "it was reasonably probable" that appellees had some oil under the northeast corner of this land, "but not of sufficient quantity to justify the drilling of a well." Nevertheless, the Court held that appellant's wells drained some oil from under Millette's land, to his damage, and awarded him $12,500 damages. Hence the second question is whether a lessor can recover damages against a lessee for drainage from his lands, where the lessee is draining the plaintiff's lands by its own well on adjoining premises, but there is not sufficient oil under the lessor's lands to justify a prudent operator in drilling a well on lessor's tract.

Appellant argues that, since the trial court found, and the evidence showed, that there was not sufficient oil under Millette's land to justify the drilling of a well, appellant as a reasonably prudent operator could not be expected to drill such an offset well, and that therefore drainage, if it occurred, was damage without in-

jury. That view seems to me to be sound, equitable, and in accord with the great weight of authority.

In Hutchins v. Humble Oil and Refining Company, 161 S. W. 2d 571, (Tex. Civ. App. 1942), error refused by Supreme Court of Texas, Hutchins sued his lessee, Humble, for damages for defendant's failure to protect plaintiff's land from drainage by its wells on adjoining lands. Humble owned the adjoining lands in fee, and on them had created two units, under a twenty-acre drilling pattern, of about 15 acres each. It had drilled one well on plaintiff's land. Plaintiff contended that defendant should have obtained exceptions to the spacing rules and have drilled an additional, second well on the plaintiff's 28 acres. Plaintiff contended that because Humble owned the well on the adjoining lands, there was a greater duty on defendant to protect plaintiff from drainage than if the draining well had been owned by a stranger. An offset well clause in plaintiff's lease to defendant was similar to that in the Millette lease, which was discussed in our original decision. The Court held, as we did in the first Millette case, that the express provision for offset wells precluded an implied obligation. It also affirmed the trial court's decision that the lessee was not under an obligation to prevent drainage beyond that of a reasonably prudent operator. The Court said:

"With reference to the 20-acre tract the jury found, as stated above, that an operator of ordinary prudence in the exercise of reasonable diligence would not have drilled an additional well thereon after well No. 1 thereon had been completed, and prior to the filing of this suit. The evidence in this record bearing on this point is voluminous. It is well settled that an operator is not under a duty to drill a well, at a loss to himself, for protection or for further development. Texas Pac. Coal & Oil Co. v. Barker, 117 Tex. 418, 433, 6 S. W. 2d 1031, 60 A. L. R. 936. And if there was some evidence from which the jury might infer there was some

drainage from the 20-acre tract, there was also evidence from which it might be inferred this drainage was largely replaced by drainage to the 20-acre tract. Certainly there was ample evidence that would support the jury in concluding that another well drilled on the 20-acre tract could have been drilled only at a loss to appellee.''

In other words, the Texas Court applied the prudent-operator test to the same type of situation which we are now considering. And the Supreme Court of Texas refused error in the Hutchins case. In developing oil and gas law in Mississippi, we have rather consistently followed the Texas decisions. Moreover, in both Hutchins and the instant case the trier of fact found that a well drilled on the complainants' land would not produce oil in paying quantities.

With reference to the Texas rule, State Line Oil & Gas Company v. Thomas, 35 S. W. 2d 746 (Tex. Civ. App. 1931), illustrates the basic principle upon which liability in damages for drainage has developed. It was a suit for damages for defendant's failure to drill offset wells in order to prevent drainage of gas, not by wells on adjoining lands owned by defendant, but by strangers. The Court said that ''it is well settled law in Texas'' that to recover plaintiff must prove that lessee could have produced gas in the offset well at a profit, and that lessee should have drilled a well with a reasonable expectation of receiving a reasonable profit after deducting the expenses. This statement was cited with approval in the significant Stott case, 159 F. 2d 174, 177, hereafter discussed. Perhaps the leading Texas case applying the prudent-operator rule is Texas Pacific Coal and Oil Company v. Barker, 117 Tex. 418, 6 S. W. 2d 1031, 60 A. L. R. 936 (1928), which was cited with approval in Hutchins.

Gerson v. Anderson-Prichard Production Co., 149 F. 2d 444 (CCA 10th, 1945), coming from Oklahoma, is also directly in point on the instant problem. The Ger-

sons sued defendant, their lessee, to recover damages because of defendant's alleged failure to develop and to protect from drainage of oil a tract of land owned by plaintiffs. Defendant also owned leases on adjoining tracts upon which it had four producing oil wells. Although there was some drainage, the evidence was not sufficient to show whether a substantial quantity of oil was drained. The Court said:

"A lease of this kind contains an implied covenant that the lessee will exercise reasonable diligence in the development of the leasehold and in the protection of it from undue drainage through wells on adjacent lands. And reasonable diligence in the development and protection of the premises means the doing of that which an experienced operator of ordinary prudence would do in the premises, having due regard for the interests of both lessor and lessee. . . . But the lessee does not bear an implied obligation to drill an offset well to prevent drainage unless, taking into consideration all existing facts and circumstances, it would probably produce oil in sufficient quantity to repay the whole sum required to be expended, including the cost of drilling, equipping, and operating the well, and also pay a reasonable profit on the entire outlay. No obligation rests upon the lessee to carry the operations beyond the point where they are profitable to him, even if some benefit to the lessor would result from them. . . . The burden rested on plaintiffs to prove the breach of the implied covenant to protect the leasehold from undue drainage. It was incumbent upon them to prove that had an offset well been drilled on the Roosevelt Place Addition, it probably would have produced or would produce sufficient oil to repay the expense of drilling, equipping, and operating the well, and also pay a reasonable return on the outlay. Wilcox v. Ryndak, supra; Ramsey Petroleum Corporation v. Davis, supra. In other words, the ultimate fact necessary for them to establish was that it probably would have paid to drill

an offset well. Wilcox v. Ryndak, supra. As indicated by the findings, the proof submitted was insufficient in that essential respect. Therefore, plaintiffs were not entitled to recover.''

Kansas and Illinois both apply the prudent operator test. Myers v. Shell Petroleum Corp., 153 Kan. 287, 110 P. 2d 810 (1941), especially at page 816; Carter Oil Co. v. Dees, 340 Ill. App. 449, 92 N. E. 2d 519 (1950). In the Dees case the adjoining wells were also operated by the same lessee, the defendant, but nevertheless the Court held that the lessee should do what a prudent operator would do, using reasonable diligence and having in mind the best interests of lessor and lessee. The Court said: ''The lessee is not absolutely bound to prevent all drainage 'where the lessor suffers no substantial pecuniary loss by such drainage.' '' To the same effect is Cooper v. Ohio Oil Company, 25 F. Supp. 304 (D. C. Wyo. 1938).

In Broswood Oil and Gas Company v. Mary Oil and Gas Company, 164 Okla. 200, 23 P. 2d 387 (1933), plaintiff sued to cancel a lease for breach of covenant to develop, and to recover damages for alleged drainage by wells of defendant on adjoining lands. The trial court held that there was no drainage, and if any, it was very slight, insufficient to make the drilling of an offset well profitable. The Court applied the prudent operator test, and said:

''It is true in this case that the defendant lessee owned leases on some of the adjoining lands to the premises here involved, and, while that is a circumstance to be considered, it is no more than that. This owning of an adjoining lease is within itself no badge of fraud. It is a circumstance to be considered in connection with all of the circumstances in evidence in determining the diligence used, or lack of diligence in drilling the premises involved, to procure production therefrom and to prevent drainage therefrom. And when all due diligence and good faith is shown the ownership of an adjoining

leasehold is unimportant.'' Compare Deep Rock Oil Corp. v. Bilby, 199 Okla. 430, 186 P. 2d 823 (1947).

Moreover, I think that the first Millette case erred in a dictum insofar as it indicated that there is an independent implied covenant not to injure the lessor's lease. 209 Miss. 703-4. That statement is not supported by any precedents. This is illustrated in Tide Water Associated Oil Company v. Stott, 159 F. 2d 174 (C. C. A. 5th, 1946). Plaintiffs owned about 200 acres of land in Anderson County, Texas. Defendants, who owned leases on that land, owned about 7,000 acres of leases in the area. In 1939 defendants began recycling operations and unitized practically all of these tracts, except that plaintiffs refused to sign a reasonable unitization agreement. Defendants went ahead with the recycling operations and injected back under the ground large quantities of dry gas. Plaintiffs sued for damages for royalties on condensate which might have been removed from the wet gas under their lands, but which defendants had now replaced with dry gas. The Court first said that there were only five implied covenants, including the covenant to protect the land from drainage through wells on adjoining lands by drilling offset wells. This covenant does not ''impose an insurer's liability upon the lessee.'' It was conceded that a prudent operator would not have drilled an additional well upon plaintiffs' land. Plaintiffs contended that there was an additional implied covenant, not to injure the lessors' lease by operations of lessee's own other premises. The Court observed that the only authority which it could find for such implied covenant was a dictum in Humphreys Oil Company v. Tatum, 26 F. 2d 882, certiorari denied, 278 U. S. 633. It said that, ''if a reasonable and prudent operator would not have drilled an additional well on the leased tract, the lessors could not have recovered from the lessees damages for draining the leased tract from adjacent premises.'' In other words, ''the implied covenant of the lessee to do nothing to impair the value

of the lease to the lessor is the duty 'to use reasonable care in good faith to protect appellees from damage caused' by drilling on the lessee's adjoining land.'' The Court held that the plaintiffs could not recover, since the defendants had done everything they could reasonably be expected to do in order to comply with their obligations under the lease. The opinion then made this statement with reference to plaintiffs, which is directly applicable to the instant case:

''If a reasonable and prudent operator would not have drilled an additional well on the leased tract, the lessors could not have recovered from the lessees damages for draining the leased tract from adjacent premises. Cooper v. Ohio Oil Co., 10 Cir., 108 F. 2d 535; Hutchins v. Humble Oil & Refining Co., Tex. Civ. App., 161 S. W. 2d 571, error refused by Sup. Ct. Tex. . . . Any damage which they suffer is damnum absque injuria and in nowise are such damages chargeable to appellants.''

Merrill, in his Covenants Implied in Oil and Gas Leases (2d ed. 1940), Sec. 111, raises the question as to whether the duty of protection is rendered more onerous by the fact that the lessee owns the draining wells, as contrasted with a situation where the lessee does not own the draining wells. He then says: ''What justification there is for the suggested distinction is somewhat puzzling to me. Why it should be any worse for the lessee to drain off the oil through his own adjoining wells than to permit others to do so, or what greater damage the lessor sustains by such conduct, I cannot see. The only apparent significance is in connection with what the West Virginia Supreme Court of Appeals calls 'fraudulent' drainage.''

In the instant case there is no evidence whatever of fraudulent drainage. There would seem to be no reason in fact or equity for a distinction between these two sets of circumstances as posed by Merrill. And the great weight of authority, as discussed above, supports that conclusion.

With perhaps the exception of two cases, the decisions cited in the controlling opinion are in my view not in point on the particular issue here. And those two cases represent a rule applied only by an inferior California court and a Federal district court in Illinois.

R. R. Bush Oil Company v. Beverly-Lincoln Land Co., 69 Cal. App. 2d 246, 158 P. 2d 754 (1945), was a decision by an inferior California court, the District Court of Appeals. The court stated in general terms that a lessee of adjoining tracts has the duty to compensate the owner of one of the tracts which it drains, and that the prudent-operator test is not applicable, since the drainage was caused by the lessee's own affirmative acts. However, the case is clearly distinguishable. There was already one well on the plaintiff's lands. And one-fourth of the total production from the draining well came from plaintiff's land. So the Court's statement of the rule went further than it had to go in that case. Production could have been obtained in paying quantities on plaintiff's lease.

Hartman Ranch Company v. Associated Oil Company, 10 Cal. 2d 232, 73 P. 2d 1163 (1937), simply held that the express covenant in that lease did not negative the existence of an implied covenant to drill additional protection wells, when the adjoining wells were owned by the same lessee. It did not consider the question of whether production in paying quantities could be obtained.

The citation of Bush Oil Company in the recent case of Federal Oil Company v. Brower, 36 Cal. 2d 367, 224 P. 2d 4, 7 (1950), was a collateral reference and not on facts involving the issue in Bush. Geary v. Adams Oil & Gas Company, 31 F. Supp. 830 (D. C. E. D. Ill. 1940), is the only case other than Bush Oil Company which I have been able to find which supports the majority opinion. The decision of the district court in Geary was not appealed, and it appears to be contrary to the Illinois rule. Carter Oil Company v. Dees, 340

Ill. App. 449, 92 N. E. 2d 519 (1950). Without making an extended analysis of the cases relied on in the majority opinion, I will summarize by saying that a careful examination of them reflects that in all except Bush Oil Company and Geary the courts were concerned with whether the obligation to drill offset wells existed *on the assumption that* production could be obtained from such offset wells in paying quantities. None of them considered the instant question, where production admittedly could not be obtained in paying quantities.

The controlling opinion indicates that Griffith v. Gulf Refining Co., 215 Miss. 15, 60 So. 2d 518 (1952), is pertinent. However, with deference, I think that case involved an entirely different situation. It dealt with Mississippi conservation statutes and rules of the State Oil and Gas Board. It was held that where a lessee obtained a permit under the spacing rules to drill on a 250-acre unit, and the well was drilled on a 160-acre tract within that unit, and production obtained therefrom, the lessee had created a de facto producing unit of 250 acres, and was liable to the lessors of the 90-acre tract incorporated in the unit for their proportionate share of the royalty. That was based upon the terms of the unitization statutes. Moreover, there was no question that a well producing in paying quantities could be drilled on both tracts within the unit.

In my opinion the following conclusions are warranted by the facts of this case and the authorities:

(1) The original Millette decision is not controlling on the limited issue here—it was not there considered or decided.

(2) The entire law of implied covenants has developed upon the basis of the prudent-operator test, and a departure from it now would depart from stare decisis.

(3) Application of the prudent-operator test to drainage by a lessee through a well on adjoining lands is in accord with the rule in Texas, two Federal Courts of

Appeal, Kansas, Illinois and Oklahoma. To the contrary, apparently, are a California Court of Appeals and a Federal district court from Illinois, although the Illinois Supreme Court applies the prudent operator test. Leading cases so holding are the Hutchins, Gerson, Dees, Stott and Broswood decisions.

(4) We must enforce the contract or lease of the parties as it was written. It was for their mutual profit. It would not be just and equitable to require a lessee to pay for oil removed from a lessor's land when it could not have prevented the removal, except by drilling a well at a loss to itself. The chancery court found that no well could have been profitably drilled on appellees' land. Moreover, as Merrill says, there is no justification for a distinction between drainage through wells of others than lessee, and drainage through other wells on adjoining lands owned by lessee. Under either situation, the fact of drainage is the same. The lessor would sustain no greater damage if the drainage were by a third party, than if it were by the lessee. The only apparent significance of a distinction between the two factual situations would arise where fraudulent drainage occurs, and there is no evidence whatever of fraud here. It is undisputed that appellant acted in complete good faith. Certainly to eliminate the prudent-operator test under these facts will extend the leasehold obligations of the lessee beyond what either of the parties intended, and beyond what any of the courts have done, with two minor exceptions.

(5) This is a suit for damages. Monetary damages cannot be recovered unless appellees show that they have been injured. But they have not been damaged or injured, when the trial court justifiably held that they owned no oil which was recoverable, in an economic sense, at a profit. Since appellees could not have gained by the production of oil from their lands, they could not lose by its subterranean drainage. Hence appellees have lost

nothing, since they had nothing of economic value. It is damnum absque injuria.

(6) Appellant had a duty to use reasonable care in good faith to protect appellees from drainage caused by drilling on adjoining lands. This necessarily presupposes what a prudent operator would do. It would not be equitable to expand the lease obligations beyond any conceivable intent of the parties, so as to hold that lessee either must prevent the drainage at an economic loss to itself, or pay for it, even though as a prudent operator it could not avoid it.

For these reasons, I respectfully dissent from the majority decision. I would reverse the decree of the chancery court and render judgment for appellant.

*Holmes* and *Gillespie, JJ.,* concur in this dissent.

### ON SUGGESTION OF ERROR

Sept. 27, 1954 74 So. 2d 731

ROBERDS, P. J., dissenting.

I am now convinced that the prudent operator test, as announced in the controlling opinion, in which I concurred, was erroneous, and that the rule announced in the minority opinion is correct. I now join and concur in the minority opinion.

I am also of the opinion that the implied covenant upon lessees to protect lessors against drainage has no application where the draining well is located upon an established spacing unit and the producer has acted in good faith and has complied with all the rules and regulations of the State Oil and Gas Board, as are the facts in the case at bar.

The Legislature has assumed extensive powers and controls over the production and apportionment of oil and gas. By its statutory enactments it has declared the

public policy of the state to be to encourage and promote
development, production and utilization of the natural
resources of oil and gas, and to protect the public and
private interests against waste, to work out the coequal
and correlative rights of owners in a common source or
pool of oil and gas so that each owner may obtain his
equitable share of production. It created the State Oil
and Gas Board and vested in it far-reaching powers.
The Board has the power to regulate the production of
oil and gas so as to prevent waste; to adopt reasonable
rules and regulations for the drilling and production of
oil and gas; to regulate the spacing of wells and to
establish drilling units; to allocate and apportion the
production of oil and gas for the prevention of waste,
"and to allocate such production among or between
tracts of land under separate ownership in such pool
on a fair and equitable basis"; to regulate the drilling
and location of wells in any pool and the production
therefrom; to enforce the correlative rights of owners
in any pool. If separate owners of tracts do not unitize
their lands the Board has the power to require them to
integrate their lands into a unit but if they do not do so
the Board itself can do that. Where lands within the
unit are owned by separate persons the Board can re-
quire the operators, when due request is made by the
owner, to deliver to such owner or his assigns his pro-
portionate share of the production from the well common
to such drilling unit. The allocation or apportionment
of production "shall be made on the basis of and in
proportion to the acreage content of the drilling units
prescribed for the producing horizons for the pool, so
that each such prescribed unit shall have the same op-
portunity to produce the same daily allowables." The
Board is authorized to grant exceptions to the unit estab-
lished by it to prevent waste and to protect and enforce
the correlative rights of the owners in the pool and the
production therefrom so that each owner has the right

and opportunity to recover his share of the recoverable oil and gas in the pool. The Board has other powers and duties but those enumerated are sufficient to establish the fact that such powers are extensive and far-reaching. Chapters 117 and 129, Laws of 1932; Chapter 154, Laws of 1934; Chapter 305, Laws of 1936; Chapter 233, Laws of 1944; Chapter 450, Laws of 1946, all repealed May 9, 1948, by Chapter 256, Laws of 1948; Chapter 220, Laws of 1950. These laws have been held constitutional, and that largely because oil and gas are fugacious substances by nature, the ordinary rules of property ownership being difficult of application to them, and further because of their rare economic value to the general public, the possibility of exhaustion, and the wisdom of proper production and prevent from waste. Superior Oil Co. v. Foote, 214 Miss. 857, 59 So. 2d 85; Humble Oil & Refining Co. v. Welborn, 216 Miss. 180, 62 So. 2d 211.

On September 11, 1947, the Oil and Gas Board adopted statewide rules for the regulation of oil and gas production and apportionment thereof in Mississippi. They provided that a unit should consist of forty contiguous surface acres, or a government quarter section of not less than thirty-six acres, upon which only one producing oil well should be located, such well not to be closer to the exterior boundaries of the unit than 330 feet and no closer than 660 feet from any other drilling or producible well. These rules then provide ''No portion of the drilling unit upon which the well is located shall be attributable in whole or in part to any other drilling or producible well in the same reservoir.'' The rules provide for the granting of an exception to prevent waste ''or to prevent confiscation of property of applicant.''

On October 29, 1948, the Board adopted new statewide rules. These rules contained substantially the same unitizing and spacing provisions as the 1947 rules, and the only provision deemed necessary to mention here is this: ''No portion of a drilling unit upon which the well

is located shall be attributable in whole or in part to any other drilling or producing well in the same pool."

On July 21, 1949, the Board adopted special rules for the Pine Ridge Field. The petition was filed by Phillips Petroleum Company. It had attached thereto a plat of the field. This plat showed the field consisted of some 400 acres. It stated that the pool was composed of some 400 acres divided into eight 40-acre units and two units of 39 acres each. It contained an outline of each unit, the acreage content thereof and the names of the owners thereof. It showed the Millette land as adjoining, but outside of, the field. It was not within a unit. The plat showed the location of the wells drilled, or to be drilled, on the units, including the location of the Hence, Carter (apparently same as Sylvester) and Artman wells. The petition prayed for special rules for that field and for allowables and allocation of production therefrom. A hearing was had and proof taken at this hearing. The Board entered an order on this petition, the parts thereof pertinent to this discussion being: It defined a basic drilling unit to contain 40 "contiguous surface acres," provided the distance between any two points did not exceed 2,100 feet, and that no well should be located nearer than 330 feet of any boundary line of the unit, and not less than 660 feet from every other well. It expressly approved and confirmed "all drilling units heretofore drilled or permitted in said Field." It recited "The production from each well shall be based on the number of acres in the drilling unit, whether fractional or not." It contained this further provision, "No portion of the drilling unit upon which the well is located shall be attributable in whole or in part to any other drilling or producible well in the pool * * *."

Due notice by publication was given to all interested parties of the time and place of the meetings at which the foregoing statewide and special field rules and regulations were adopted. Millette did not undertake to assert

any right, or contention, at any of these meetings, nor did he ask the Board to make an exception in his case, nor did he appeal from the action of the Board.

Permits were granted by the Board in 1948 to drill the Hence, Artman and Carter wells. The applications for the permits showed the location of each unit, the boundaries thereof, the owners, and the location of the Millette property as adjoining, but outside of, the units. Each disclosed the location on the unit of the well proposed to be drilled, and the distance from each proposed well to the boundary line of the unit. For instance the Artman well was not to be nearer the line than 660 feet. The three wells were drilled shortly after issuance of the permits and all were drilled at the locations, and the distances from the property lines, in accordance with the permits and production payments have been made on comparative surface acreage basis within the units.

The reasons, among others which might be mentioned, for concluding that the implied covenant prohibiting depletion by lessee of drainage from lands of lessor has no application where lessee acts pursuant to and in accordance with the rules and regulations of the Oil and Gas Board, no bad faith being involved, are:

First, the Conservation Act itself vests in the Board the power and imposes the duty to ''allocate such production among or between tracts of land under separate ownership in such pool on a fair and equitable basis,'' and such allocation or apportionment of production ''shall be made on the basis of and in proportion to the acreage content of the drilling units prescribed for the producing horizon for the pool, so that each such prescribed unit shall have the same opportunity to produce the same daily allowables.'' In other words, the allocation shall be on the basis of the comparative surface acreage in each unit.

Second, the rules adopted by the Board, both statewide and for Pine Ridge Field, provide that ''No portion of

the drilling unit upon which the well is located shall be attributable in whole or in part to any other drilling or producible well in the same reservoir (pool)''; and the special rules and regulations for Pine Ridge Field provided ''The production from each well shall be based upon the number of acres in the drilling unit, whether fractional or not.''

Third: In Humble Oil & Refining Co. v. Welborn, 216 Miss. 180, 62 So. 2d 211, this Court held that Welborn would not be permitted to prove that his land contained more oil than other lands within the unit, and denied his contention that he was entitled to a greater proportion to oil allowables than other owners within the unit whose lands were not as productive of oil as his lands. The case quoted the statute to the effect that ''any allocation or proportionment of production shall be based on the basis of and in proportion to the acreage content of the drilling units prescribed for the production horizon for the pool.'' The Board had fixed compensation upon the basis of comparative acreage ownership.

Fourth: This Court has held that production on any part of the unit extends and perpetuates leases on other separately owned lands within the unit, although there is no actual, or contemplated, drilling upon such other lands. Superior Oil Co. v. Beery, 216 Miss. 664, 63 So. 2d 115; Texas Gulf Producing Co. v. Griffith, 218 Miss. 109, 65 So. 2d 447.

In the Beery case, supra, the opinion states that one contention made by Beery was ''(1) that he was entitled to recover on the ground that the appellant, as lessee of the 50-acre tract, had violated its duty under its leases not to impair the value thereof, in that it had drained, and is still draining, gas from the 50-acre tract through the unit well on the Dale tract.'' In responding to that contention this Court said: ''The Dale well was drilled at a distance of approximately 1,000 feet from the 50-acre tract in question which is situated in the SW¼ of

Section 28, and it would seem that no obligation implied by law to protect the leased premises from drainage was violated where the same lessee also held a lease on the Dale tract and drilled the well thereon under the express authority of the Dale lease, and where under the conservation laws of the State, subject to which appellee had purchased his mineral interest, the lessee of the 50-acre tract was prohibited from drilling an off-set well thereon. In other words, since no express provision of the lease from Walker to Gholson was violated, it would seem that there would be no liability on the first theory of the amended bill of complaint, since the obligation implied by law to protect against drainage is inapplicable where the lawful rules and regulations of the State Oil & Gas Board for the conservation of oil and gas are complied with." It is true that in the case at bar Phillips was not prohibited from drilling an off-set well, but the chancellor held he was under no duty to do so.

In 58 C. J. S., page 628, the statement is made " * * * that the drainage area of a well is equivalent to the spacing area prescribed by the rule."

Fifth: The stated conclusion would seem inevitable from a practical standpoint. If every marginal owner is permitted to institute litigation each time a witness may give it as his opinion that some oil is being drained from the marginal land through a well on the unitized tract confusion will be confounded in the production of oil and gas. This case illustrates that. The Artman well, through which it is claimed Millette oil is being drained, was drilled in 1948. The amended bill of complaint was filed herein in March 1951. Phillips, the producer, had paid all royalties to the owners in the unit. If he has to pay Millette $12,500.00 he will have paid this amount twice. He has overpaid the unit owners. Apparently he should have a right of action to recover that back from such unit owners. If obligations are to be changed and varied in this manner, then Millette

should have made all unit owners parties to his litigation. There may be, for all that is shown, other marginal owners who can assert claims against the producer. How many is not shown. Conceivably there might be a dozen marginal owners bringing litigation at any time before the running of the statute of limitations. In any litigation pertaining to production in the unit all unit owners and all marginal owners will need to be made parties. The driller will have to interplead all marginal owners if he is to be protected. If he must pay unit owners on an acreage basis within the unit and then pay marginal, or adjoining, owners whatever they may recover, then no producer could possibly know his liabilities or money obligations, regardless of the terms of his lease. In the case of gas liability might extend far beyond adjoining, or marginal owners, gas possessing by nature greater migratory qualities than oil. This, it would seem, may prove disastrous to the oil and gas industry of the State.

Appellee was not without remedy if in fact his oil has been drawn through a well on the unit. He had his remedy under the prudent operator rule had circumstances been such as to require the drilling of a well on his land. He also had the right, and, no doubt, would have been given the opportunity, to show the Board he was entitled to an exception from the general spacing rules, and, in case of refusal, a right to appeal to the circuit court and then to this Court.

It should be added that the question just discussed was raised for the first time on the suggestion of error; therefore, it was not dealt with in the learned majority opinion. Ordinarily we do not take note of propositions raised for the first time on suggestions of error. However, we may, and usually will, do so where decision of the question is of grave importance to the public and affects the rights of many people who are not parties to

the litigation. Supreme Court Rule 6; Robbins v. Berry, 209 Miss. 422, 47 So. 2d 846; Wright v. I. C. R. Co., 196 Miss. 150, 16 So. 2d 381.