Monsanto Chemical Company, et al. *v.* Sykes, et al.

No. 42424          December 3, 1962          147 So. 2d 290

January 21, 1963          149 So. 2d 20

*Heidelberg, Woodliff & Franks, Scott Tennyson,* Jackson; *Sam Pickard, B. M. Allen,* Houston, Texas, for appellants.

*Satterfield, Shell, Williams & Buford,* Jackson; *Mc-Farland & McFarland,* Bay Springs; *Walker & Sullivan,* Mendenhall, for appellees.

*Julian P. Alexander, Jr., Robert M. Bass, Jr., Brunini, Everett, Grantham & Quin, W. W. Jackson, Harry D. Owen, Joe A. Thompson, Wells, Thomas & Wells,* Jackson; *Armstrong & Hoffman,* Hazlehurst; *Tom P. Caldwell, John W. Kelly, Jr., Charles C. Richmond,* New Orleans, La., Amici Curiae.

GILLESPIE, J.

This appeal involves implied covenants to develop, and to protect leased premises against drainage by appellants' oil well on adjoining land. Complainants below were the royalty owners under an oil and gas lease and the defendants below were the lessees under an oil and gas lease. From an adverse decree awarding complainants a money judgment for breach of said implied covenants and the cancellation of the oil and gas lease as to certain lands, defendants appeal.

The lease involved in this litigation was executed on July 17, 1954, by James B. Sykes and wife, two of the appellees, to Tip Ray for a ten-year primary period, covering 940 acres of land. By assignment the appellants became the lessees of all of the land involved in this suit

# MAP OF
# MERIT FIELD AREA
## SIMPSON COUNTY, MISSISSIPPI

BY

ENGINEERING SERVICE — JACKSON, MISSISSIPPI

AUGUST, 1962.

A-535

**PERTINENT WELL COMPLETION DATES**

| NAME | COMPLETION DATE | LOCATION |
|---|---|---|
| MONSANTO NO.1 Magee | 3-19-59 | NW SW SECTION 17 |
| MONSANTO NO.2 Magee | 8-8-59 | SE SE SECTION 18 |
| A O PHILLIPS No.1 Allison-Sykes-Welch | 8-25-59 | NE SW SECTION 17 |
| MONSANTO NO.1 Bill Robert | 1-14-60 | SW SW SECTION 17 |
| CONOCO NO.1 Allison-Sykes | 1-24-60 | SE SW SECTION 17 |
| FAIRCHILD NO.1 Allison-Sykes | 6-6-61 | SE NE SECTION 18 |
| FAIRCHILD NO.2 Allison-Sykes | 7-15-61 | SE NW SECTION 17 |
| JUSTISS-MEARS NO.1 Allison-Sykes | 9-22-61 | SW NW SECTION 17 |
| MONSANTO NO.1 Addie | 12-1-61 | NE SE SECTION 18 |
| MONSANTO NO.1 Magee-Sykes | 2-21-62 | NW SE SECTION 18 |

— LEGEND —

+ —— DRY HOLE
• —' OIL WELL

SCALE IN FEET
0    600    1200    1800    2400

constituting nine quarter-quarter sections and one fractional quarter-quarter section. These several forty-acre tracts are shown with other lands on a map which the reporter will reproduce with this opinion. The lands involved in this suit are designated as tracts 1 to 10 inclusive.

The appellees owned other oil and gas leases, including the W½ of the SW¼ of Section 17, Township 1 N, Range 4 E, and all that part of the S½ of Section 18, Township 1 N, Range 4 E, south and east of Strong River as indicated on the map. On March 19, 1959, appellants completed the discovery well in the Merit Oil Field known as the Monsanto No. 1 Magee, located in the NW¼ of the SW¼ of Section 17, Township 1 N, Range 4 E, which is the forty acres immediately south of tract 1 involved in this suit. This well was completed in oil sands designated in an order of the Mississippi State Oil and Gas Board, dated September 16, 1959, establishing special field rules for the Merit Field in Simpson County, Mississippi, as (1) the Paluxy oil sands as therein defined, and (2) the Mooringsport oil sands as therein defined. These strata of oil sands were at various depths deeper than 11,000 feet subsea. The Mooringsport sand was depleted after a relatively small amount of production and does not play any part in this lawsuit.

On March 31, 1959, one of the appellees, James B. Sykes, apparently spokesman for the royalty owners, appellees here, wrote Jett Drilling Company, driller for appellants of the discovery well known as Monsanto No. 1 Magee, that he expected a well to be drilled on tract 1, being the north direct offset to the discovery well, within sixty days or "in conformity with prudent operation so as to prevent drainage." On April 17, 1959, drilling operations were commenced by Jett Drilling Company for appellants on Monsanto No. 1 Allison-Sykes on tract 1. This well was located near the center

of said forty-acre tract and as near as surface conditions would permit to an old location known as Carter No. 1 Allison, which had been drilled at some previous time to a depth of 6,000 feet, and which was abandoned as a dry hole. The reason the location was made close to the old Carter well was the fact that the Carter well was known to be high on structure.

Jett Drilling Company drilled the Monsanto No. 1 Allison-Sykes well to a depth of 13,466 feet and attempts were made to produce from five different sands: The Rhodessa, which produced about one mile to the west but which was not produced and has never produced in the discovery well; the Mooringsport; a sand designated as the 11,700 foot sand; the Paluxy; and the 11,900 sand, as defined thereafter in an order of the Mississippi State Oil and Gas Board as the interval in the Paluxy formation between 11,892 feet and 11,918 feet.

Although appellants spent $318,000 in an attempt to make the said Monsanto No. 1 Allison-Sykes a producing well, they were unable to do so and abandoned their efforts on July 19, 1959.

Appellants had no communication from the appellees following the abandonment of said well on July 19, 1959, until a telephone conversation in January or February of 1960, and a letter on February 29, 1960, when one of the attorneys for appellees wrote to one of the appellants requesting that the Monsanto No. 1 Allison-Sykes well be reworked. After some correspondence with reference to what zone appellees desired to have retested, on April 8, 1960, appellants entered into some kind of agreement, which is not revealed of record, with A. & N. Producing Company to rework the Monsanto No. 1 Allison-Sykes well. Jett Drilling Company and A. & N. Producing Company undertook the reworking. Some refer to this transaction as a sale of the dry hole, and it is indicated, although not clearly shown, that Jett Drilling Company and A. & N. Producing Company were

limited to that particular well bore. A. & N. Producing Company, of which Clyde Alexander is part owner, is recognized as a competent firm to do that kind of work. The A. & N. Producing Company was operating over 70 oil wells for other firms. Mr. Alexander is a geologist. On April 21, 1960, reworking operations commenced on the Monsanto No. 1 Allison-Sykes well and continued until January 25, 1961. The testimony showed in considerable detail the procedures employed in reworking the well to try to bring in production. Some oil was produced, but not in commercial quantities.

On January 2, 1961, appellees offered to buy back the lease on tract 1 on all formations above the Rhodessa sand, stating they had another operator who wanted to drill further south on the same forty-acre tract. This was the first time that any of the appellees made any request to move to a new location south of the Monsanto No. 1 Allison-Sykes location. This request was denied by appellants. On January 25, 1961, A. & N. Producing Company and Jett Drilling Company, after spending $165,000 reworking the well, concluded that they could not complete the Monsanto No. 1 Allison-Sykes as a commercial oil well and abandoned it as a dry hole. In the meantime, subsequent to the completion of the discovery well, four more wells were completed in the Merit Field in 1959, five were completed in 1960, and eleven wells in the year 1961. At the time the Monsanto No. 1 Allison-Sykes was abandoned on January 25, 1961, no well had been completed as a commercial producer north of the center lines of Sections 17 and 18 in said Township 1 North, Range 4 East, in the Merit Field. The first well north of said line was the Fairchild No. 1 Allison-Sykes, the northwest diagonal offset to the discovery well and the direct west offset to appellees' tract 1, which was completed June 6, 1961, producing from the 11,900 foot sand.

On July 15, 1961, the Fairchild No. 2 Allison-Sykes, the diagonal northeast offset to the discovery well and the direct east offset to appellees' tract 1, was completed as a commercial oil well producing from the 11,900 foot oil pool. On July 21, 1961, appellants farmed out or assigned to Leigh Latimer the lease on appellees' tract 1, the same tract on which was located the Monsanto No. 1 Allison-Sykes dry hole. Apparently no well north of the center line of Sections 17 and 18 has produced from the Paluxy sand.

On August 7, 1961, this suit was filed in the lower court and one day before suit was filed and on August 6, 1961, Leigh Latimer spudded in a well, known as Justiss-Mears No. 1 Allison-Sykes, 330 feet south and some distance west of the location of the Monsanto No. 1 Allison-Sykes dry hole. The cost of this well is not shown of record but the minimum estimate of its cost was $150,000. It was completed as a commercial oil well on September 22, 1961, producing from the 11,900 foot sand.

The appellees offered expert testimony that the discovery well drained 85,362 barrels of oil from appellees' tract 1 from the Paluxy sands up to November 8, 1961, the time of trial. Appellees' expert also testified that from January 1, 1961, when the discovery well began producing in the 11,900 foot sand, until October 22, 1961, the date the Justiss-Mears No. 1 Allison-Sykes was completed by Leigh Latimer on tract 1, that said tract 1 was drained of 11,915 barrels of oil from the 11,900 foot sand by the discovery well. The testimony on behalf of appellants in reference to the amount of drainage was considerably less than the estimates of appellees' witnesses. It was conceded there was drainage from tract 1 and a small amount of drainage from tract 4 attributable to the discovery well. Considerable testimony was taken with reference to whether the first well attempted on tract 1, the Monsanto No. 1 Allison-Sykes, was a

prudent location and whether it could have been made to produce. In view of the court's holding, it is unnecessary to go into any details in regard to this testimony.

The trial court found that oil bearing sands were found in the Paluxy and 11,900 foot sands in the Monsanto No. 1 Allison-Sykes well and that appellants were not negligent in their attempts to complete said well. The trial court found that when the Monsanto No. 1 Allison-Sykes on tract 1 was abandoned the appellants knew that this tract was productive in the Paluxy and 11,900 foot sands further south toward the discovery well, and that a most excellent location for another well would have been as near the discovery well as the rules and regulations of the Mississippi Oil and Gas Board would allow. The chancellor held that from the time of the abandonment of said Monsanto No. 1 Allison-Sykes well that appellant knew the Paluxy sands in tract 1 were being drained by the discovery well. The chancellor found that the defendants knew from July 19, 1959, the date of the abandonment of Monsanto No. 1 Allison-Sykes, that the 11,900 foot sand would produce if drilled farther to the south, and that if said sand had been drilled it would have made the full allowable attributed to that sand by the Mississippi Oil and Gas Board. The court found without supporting evidence that the acts of A. & N. Producing Company and Jett Drilling Company to rework the Monsanto No. 1 Allison-Sykes well was not the act of a reasonable and prudent operator, and that the assignment by appellants of their interest in the hole to A. & N. Producing Company was a wilful fraud. There is no evidence whatever of any fraud.

The lower court held that there was a duty on the part of appellants to begin drilling another well and complete the same within ninety days after July 20, 1959, the date the Monsanto No. 1 Allison-Sykes was first abandoned. The court gave judgment against appellants for non-development of the 11,900 foot sand on tract 1

in the amount of $87,142.18, including interest, representing royalty on 238,000 barrels of oil that should have been produced by defendants from said sand from October 20, 1959 to October 2, 1961. The court gave judgment against appellants for $24,159.58, representing one-eighth royalty, plus interest, on 85,362 barrels of oil found to have been drained from the Paluxy sand from tract 1 from October 20, 1959 to November 8, 1961, the date of trial. The court also gave judgment for $1,491.66 found to have been drained by the discovery well from tract 4, which is located one-fourth mile west and north of the discovery well. The total judgment was $112,793.42. On the ground that appellants had refused prospective developments, the court cancelled outright the lease as to tracts 6, 7, 8, 9 and 10. The court ordered drilling to commence on tract 4 within ninety days from the date of the decree or the lease as to said tracts 4 and 5 would stand cancelled; and in case of a completion of a commercial well on tract 4, then drilling operations should begin within ninety days on tract 5 or the lease would stand cancelled as to said tract 5. The court also ordered appellants to begin drilling on tract 2 within ninety days from the date of the decree or the lease would stand cancelled as to tracts 2 and 3: and in case a commercial well was produced on tract 2, that drilling operations should begin on tract 3 within ninety days or the lease would stand cancelled as to said tract 3.

We first consider whether the lower court erred in cancelling the lease as to tracts 6, 7, 8, 9 and 10, and in conditionally cancelling the lease as to tracts 2, 3, 4 and 5.

■■■ The question decisive of this aspect of the case is whether the proof was sufficient to establish an implied covenant to develop. Before there is any duty to drill additional wells or to reasonably develop, it must appear that the additional well or wells would in reasonable probability result in profit to the lessee, or, in other

words, the additional well would probably produce oil in paying quantities. Clifton v. Koontz, 325 S. W. 684 (Tex.). ██ ██ The proof fails to show that tracts 2, 3, 5, 6, 7, 8, 9 and 10 would probably produce hydro carbons in paying quantities if drilled. The proof is to the contrary. The experts for both appellees and appellants testified that said tracts were not underlain with sands producing in the Merit Field and it is a manifest fact from all the proof that a prudent operator would not drill any of said tracts with a reasonable expectation of producing from any of the sands known to be producing in the Merit Field. The experts for both parties agreed that probably tract 4 would produce if drilled in the southeast corner. (They were mistaken as hereinafter shown). The lower court based its action in cancelling the lease on the grounds that appellants had no plan to develop said tracts. The primary term of the lease had not yet expired. In *Koontz,* the Court held that in Texas there is no implied covenant to explore as distinguished from the implied covenant to conduct additional development after production is obtained.

██ ██ We hold that the lower court erred as a matter of law in cancelling the lease as to tracts 6, 7, 8, 9 and 10 and in ordering the drilling or cancellation as to tracts 2 and 3. Wells v. Continental Oil Co., (Miss.), 142 So. 2d 515. In connection with the requirement to drill tract 4 within ninety days or suffer cancellation of tracts 4 and 5, there appears in the briefs a certificate under the seal of the Mississippi State Oil and Gas Board and the signature of the Secretary thereof that tract 4 was drilled to a depth of 13,100 feet and the well was dry and abandoned on May 1, 1962. ██ ██ We take notice of the official records of the Oil and Gas Board. May v. State, 240 Miss. 361, 127 So. 2d 423. Since it appears that appellants complied with the decree as to tracts 4 and 5, the appeal is moot as to those tracts, and the lease is

still in force by reason of compliance with the decree. We, therefore, reverse the decree as to said cancellation of the lease and enter judgment here for appellants adjudging the lease to be in force as to tracts 2, 3, 4, 5, 6, 7, 8, 9 and 10.

We next consider whether the lower court erred in giving judgment for the sum of $1,491.66 for drainage from tract 4. This raises the question whether the drainage from tract 4 was substantial and whether the proof justified the judgment. Only one witness testified in reference to the drainage of tract 4 by the discovery well. This witness testified that the $1,491.66 represented royalty on three-fourths of the estimated drainage from said tract 4 and that said amount was ". . . . the maximum amount of drainage which could conceivably have come from under . . . ." tract 4. The discovery well was south and one-fourth mile east of tract 4. We hold that the drainage of tract 4 was not substantial in relation to the cost of drilling and producing oil in the Merit Field. We also hold that the evidence was not sufficient to justify a judgment based on such drainage. We hold there is no implied covenant to protect against drainage for property remote from the draining well.

We now consider contentions of appellants concerning the money judgment for drainage of the Paluxy sands and for failure to reasonably develop the 11,900 foot sands. What seems to be two separate questions involving two separate implied covenants is really one overall question. For if what appellant did in their efforts to produce from tract 1 complied with the drainage covenant, it also complied with the development covenant, if in fact the latter is applicable. The implied covenant that a lessee protect his lessors' land from drainage places a somewhat higher duty to drill an offset well than does the development covenant, especially where the lessee is doing the draining. Appel-

lees, lessors, sought and recovered money judgment for draining the Paluxy sand from October 20, 1959 to November 8, 1961, and for non-development of the 11,900 foot sand, for which appellees obtained a judgment for royalty on 238,000 barrels of oil that the 11,900 foot sand could have produced from October 20, 1959 to October 2, 1961. Therefore, appellees claimed the benefit of both covenants, the development covenant as to the 11,900 foot sand and the drainage covenant as to the Paluxy sands. We will assume without deciding that appellants were under an implied duty to develop tract 1 in the 11,900 foot sand although it did not produce in the discovery well until January 1, 1961, and it does not appear when or where that sand was first discovered and produced in the Merit Field. Drainage began from the Paluxy sand when the discovery well was completed. Appellants began drilling on tract 1 within thirty days after completion of the discovery well and attempted to complete the well in both the Paluxy and 11,900 foot sands. While we assume that the two covenants were both in operation and required the drilling of tract 1, we measure what appellant did in their efforts to produce from tract 1 by the duties arising from the implied covenant of a lessee to protect his lessor from drainage by lessees' well on other land.

The case around which a considerable part of the argument revolves is that of Phillips Petroleum Company v. Millette, 221 Miss. 1, 72 So. 2d 176. Appellees contend in effect that *Millette* announced a rule that if lessee drains the lands of his lessor by the operation of lessee's well on adjoining land, the lessee is liable at all events. Appellees also contend that *Millette* abolished the prudent operator rule in connection with the implied covenant to protect against drainage.

We have carefully considered *Millette* and in the light of facts in that case we conclude that it does not apply to this case. Two facts alone distinguish it from the

present case. In *Millette,* the lessee did not spend any money in an effort to develop Millette's land and affirmatively prevented Millette from doing so himself or having others develop his land. No more need be said in order to distinguish *Millette* from the present case. We also find that *Millette* does not establish a rule of liability at all events when the lessee drains his lessor's lands. Nor did *Millette* abolish the prudent operator rule except that the said rule did not apply to the facts of that case. The application of *Millette* to the present case would be extending the *Millette* doctrine.

Appellants undertook to capture the oil under tract 1 by drilling the Monsanto No. 1 Allison-Sykes, and reworking that well at a total cost to appellants and their assignees of $483,000, and by assigning the lease to Leigh Latimer, who subsequently drilled at a cost of approximately $150,000 the Justiss-Mears No. 1 Allison-Sykes, which produced from the 11,900 foot sand. The question then arises whether that done by appellants and their assignees complied with the covenant to prevent drainage of tract 1.

The obligations imposed upon appellants by the implied covenant is designed by equity to require fair and reasonable efforts on the part of lessees to prevent drainage. Equity neither requires improvident actions on the part of lessees nor permits lessees to deal unfairly or unreasonably with lessors. It recognizes that duty is measured by what is reasonable under the circumstances.

The hypothetical ordinary, prudent operator test is the broad standard used to resolve many disputes between lessees and lessors. Summers Oil and Gas, Perm. Ed., Vol. 2, Secs. 399, 463, 464. We apply the prudent operator rule as the standard to determine whether appellant's efforts to produce from tract 1 complied with the covenant in this case. The location of Monsanto No. 1 Allison-Sykes was manifestly a prudent location

at the time it was made. The efforts of appellants to cause the well to produce were in good faith and the lower court so found. After spending $318,000, appellants decided to abandon the well on July 19, 1959. At that time the discovery well was the only producing well in the Merit Field. Since appellants had drilled a dry hole on tract 1, it was logical, fair and reasonable to await further drilling and study of the underground structures before again drilling on tract 1. After July 19, 1959, appellees did not demand any further activity on the part of appellants until it requested reworking of the Monsanto No. 1 Allison-Sykes early in the year 1960, after which appellants transferred, or assigned, the Monsanto No. 1 Allison-Sykes hole to A. & N. Producing Company for reworking. There is no testimony justifying the finding by the trial court that this assignment was a wilful fraud. The proof indicates that A. & N. Producing Company and Jett Drilling Company had some kind of joint operation in reworking this well. Jett Drilling Company had drilled the discovery well and the original hole at the Monsanto No. 1 Allison-Sykes location, and A. & N. Producing Company had done the geological work in connection with this drilling. No one could have known any more about the well than these two firms. Moreover, A. & N. Producing Company was admittedly competent to do such work. After the reworking operations began, they were continued under the directions of A. & N. Producing Company, and the testimony shows that these operations were prudently carried out and proper methods employed. During the time the well was being reworked it is not probable that a permit could have been obtained to drill another well on that forty acres if such effort had been made. Finally, on January 25, 1961, A. & N. Producing Company concluded that the well would not produce commercially and they abandoned it as a dry hole. A. & N. Producing Company spent $165,000 in the reworking operation.

██ █ Upon consideration of all the facts and circumstances attending the efforts of appellants and their assignees to produce oil from tract 1, it manifestly appears that their actions were that of an ordinary prudent operator and that a fair and reasonable effort was made at considerable cost to prevent drainage of tract 1. The learned chancellor was manifestly in error in finding to the contrary.

The money decree for drainage and non-development of tract 1 is reversed and judgment is rendered here adjudging that there is no liability for drainage of the Paluxy sands or non-development of the 11,900 foot sand up to three months from January 1, 1961. We add three months to January 25, 1961 for the reason that the lower court found that was a reasonable time to begin and complete an oil well in the Merit Field.

The case is remanded so that the lower court may determine whether appellants are liable for drainage of tract 1 from the Paluxy and 11,900 foot sands after April 25, 1961.

Reversed, rendered in part, and remanded in part.

All Justices concur, except Arrington, J., who took no part.

McELROY, J., specially concurring:

I wish to concur in the able opinion of the Court in this case.

The opinion states: "The hypothetical ordinary, prudent operator test is the broad standard used to resolve many disputes between lessees and lessors." I maintain that the equity rule of Phillips v. Millette also is a broad standard used to resolve many disputes between lessees and lessors. The prudent operator's rule applies where profits of a well amount to more than the cost of drilling, therefore, it is a paying well. The equity rule of *Millette* is that, if a prudent operator could not afford to drill for oil and is draining quantities of oil

from the lessor's adjoining tract, he should pay him a royalty, for the simple reason that it is costing him less money to pay royalties than it would to drill on the leased land, since under the prudent operator test he would have lost money.

The equity rule adopted in the Millette cases simply means that implied covenants protect against drainage. Of course, the prudent operator rule would apply if it had been advantageous to the lessee to have drilled a well and made a profit.

There are cases in which it would not be advantageous for a prudent operator to drill because he would lose money, yet if he does not drill, he would be draining his adjoining lease, making himself richer, and at the same time making the lessor poorer. Therefore, under this equitable rule it is better for him to pay royalty because he is saving money by not having to drill a well. I believe that we should protect a lessor where it would not be advantageous for the lessee to drill.

I believe that each case should depend on the question of whether there has been sufficient proof to show that there is really a drainage from the lessor. If lessee is draining oil from an adjoining lease, and thereby gaining a profit by not having drilled a well, equity and good conscience say royalty should be paid the lessor.

It is argued that there will be endless lawsuits filed. But each case must stand upon its own facts, and, if there is sufficient or conclusive proof that there is drainage, I believe it is best that the lessee should pay a royalty, even though the prudent operator rule will not impose liability.

The oil business is a big one. It costs money to drill wells, and there are times when the lessee may speculate and drill exploratory wells, and, if he is lucky, he makes a profit. But if he drains lands of his adjoining lessor, of course, he is still making a profit, but this gain is at the expense of his adjoining lessor.

In this case Monsanto did about all it could with reference to the lands in question. I concur in the majority opinion.

## ON SUGGESTION OF ERROR

KYLE, J.

Appellees suggest that our original opinion be clarified so that the parties may know whether this Court limited appellees to seek damages after April 25, 1961, from the 11,900 foot sand to the drainage covenant. This Court did not intend to make any adjudication as to any of the rights of the parties after April 25, 1961. Therefore, if appellees desire to claim liability for damages for nondevelopment of the 11,900 foot sand after April 25, 1961, they may do so. As to liability therefor, we express no opinion.

After a careful examination of the suggestion of error, we are of the opinion that it should be, and it is, overruled.

Suggestion of error overruled.

All Justices concur, except Arrington, J., who took no part.