MONSANTO CHEMICAL COMPANY *v.* ANDREAE

No. 42389        December 3, 1962        147 So. 2d 116

*B. L. Allen, Sam Pickard,* Houston, Texas; *Brunini, Everett, Grantham & Quin, John M. Grower,* Jackson, for appellant.

*Satterfield, Shell, Williams & Buford,* Jackson, for appellee.

Jones, J.

This case was originally filed in the Circuit Court of Simpson County but transferred to the Chancery Court. It was a suit for damages filed by Andreae against Monsanto. On the final hearing a judgment was rendered in favor of Andreae for $1,581.93 as compensation for drainage of certain oil alleged to have been drained from lands in which Andreae owned an interest.

The basis of the suit was that Monsanto was the owner of a lease executed by Andreae on lands in one forty-acre tract. Monsanto, as lessee, had drilled a well in the adjacent north forty, which well it was claimed was draining oil from under the forty in which Andreae had given his lease. All the lands involved were in Simp-

son County in Township 1 North, Range 4 East. In order to avoid describing further the said forties in land numbers, we here designate them: The forty on which Monsanto drilled a well known as the Ainsworth well, and about which this suit arose, is the SW¼ of SE¼ of Section 17. Andreae owned a one-half interest in the minerals under the NW¼ of NE¼ less the west 9 acres in Section 20. The dry hole hereinafter mentioned was drilled in the NE¼ of NW¼ of Section 20. The Monsanto forty will hereafter be referred to as the Ainsworth well. The NE¼ of NW¼ of Section 20 will hereafter be referred to as the Grantham well or forty. The lands under which Andreae held his one-half of thirty-one acre lease will hereafter be described as the Andreae lands.

The suit arises from these facts: Monsanto had a one-half lease on Andreae's lands and it also had a lease on the Ainsworth forty, as well as on the Grantham forty. In the fall of 1959, Monsanto drilled the Ainsworth well, and a short while afterwards Andreae wrote Monsanto demanding that it drill on his lands, this letter being written after the completion of the Ainsworth well.

On receipt of this letter Monsanto wrote Andreae that while under the words of its lease it had no obligation to drill on Andreae's land, they were very carefully studying the feasibility of doing so and were hopeful that it would be in a position to advise him shortly as to the plans. Andreae's letter to Monsanto, was dated February 24, 1960, and the Lion Oil Company, a division of Monsanto, answered his letter on March 2. On April 15, Lion Oil Company wrote Andreae that it was of opinion, after a careful study of the matter, that it could not justify a well on any of the acreage covered by Andreae's lease, but that it had instructed the land department to try to "farm out" the lease for a well, but so far its efforts had not been successful. However,

they were continuing an endeavor to secure a farm out. They also advised that the Arkansas Fuel Oil Company, which held a lease on the other undivided one-half interest in said land, was attempting to farm out its lease.

On May 13, 1960, a farm out letter agreement was made with R. H. Reeves, under the terms of which Monsanto promised and agreed to transfer to Reeves six leases, reserving an override, provided that Reeves, on or before May 15, commenced operations for the drilling of a well in search of oil and gas in the Grantham forty. Said well was to be drilled to a depth of 13,000 feet sub-surface, or to a depth of twenty-five feet in the anhydrite, whichever was shallower. It was agreed that if Reeves complied with such request by drilling said well it would become the owner of six leases listed in exhibit attached to said letter agreement, which list included the Andreae lease. All of these leases covered lands in and around the Andreae lands.

The testimony showed that Monsanto or its subdivision, Lion, had been trying sincerely to find somebody to take a farm out on this lease but had been unsuccessful. There is no evidence of bad faith. One of the men, in talking with Andreae himself, suggested that Andreae take it, but he just smiled. The testimony showed that they tried a number of people but found no one that would take the well and drill it until they finally came in contact with Reeves. Reeves did drill the well, and it was a dry hole.

On the trial of the case, there was introduced in evidence by the complainant Andreae an isopach map made by his engineer in which it was shown that in the northwest corner of Andreae's forty there was indication of oil. In the Andreae forty this indication crossed the said northwest corner of the forty and included a north portion of the nine acres on which Andreae had no interest. On the Grantham forty this map indicated that there were twelve feet of oil sand

across a considerable part of the north portion. There was only a small part of this twelve foot strip that crossed the northwest corner of Andreae's land. The Grantham forty, under this map made by complainant's engineer, had the potential for a much better well and for much more production than the Andreae forty, and would disclose information as to the probability of recovery on the Andreae lease. The evidence showed there were only about 25,000 barrels of recoverable oil on the entire forty in which Andreae was interested. Andreae's proof was to the effect that the Ainsworth well drained about seventy-five percent of this recoverable oil from the Andreae forty and that another well in which Monsanto was not interested drained approximately twenty-five percent. The proof further showed that oil at that time had a net value of $2.70 per barrel, so that the total value of all the oil that might have been recovered under the complainant's own testimony was less than $70,000. Plaintiff's testimony further showed that to drill a well on the Andreae lease would cost from $100,000 to $150,000. Other wells in the area had cost much more.

The chancellor found that the complainant was entitled to recover $1,581.93 by the following computation: While the Andreae forty had 25,000 recoverable barrels, there were only 12,500 barrels that could be allotted to drainage from Andreae's lease; that seventy-five percent of the 12,500 barrels, or 9,375 barrels, were drained by the Ainsworth well; that Andreae's royalty, being one-sixteenth, was equivalent to 585.9 barrels, which at $2.70 per barrel totaled $1,581.93.

Both Andreae and his engineer testified that a reasonably prudent man would not have drilled a well on the Andreae forty to recover 25,000 barrels of oil because the expense of drilling and recovery would amount to more than the value of the oil.

Recovery was sought on the strength of Phillips Petroleum Company v. Millette, 221 Miss. 1, 72 So. 2d 176.

It was contended that because the chancellor found drainage occurred from Andreae's lease through the Ainsworth well owned by Andreae's lessee, the said lessee was liable to Andreae regardless of every other fact. It is insisted here that was the holding in the. Millette case. We do not agree that such was the holding. It is true that in *Millette* the Court said that neither the rule of capture nor the prudent operator rule was applicable to that case under the facts there. That was, however, a very different case from the case we have here. As stated by Judge Hall, the appellant's position in that case was entitled to scant consideration in a court of equity because Phillips had refused to drill a well on appellee's land, contending that no oil could be produced from it, and had also refused to cancel the lease so that the lessor might undertake to find some other operator to drill, and after refusing this, had further declined to accept a substantial consideration for cancellation of the lease. Phillips refused to do anything and refused to let anybody else do anything to ascertain whether there was any oil on Millette's land. We do not have such a case here. Also, in the Millette case, the chancellor found that Phillips had drained $100,000 worth of oil from Millette's land, and this Court held such was a substantial amount. It also found that a well could have been drilled for $70,000 which would have left Phillips a profit after drilling and after paying Millette his royalty.

Here we have no such situation. It is claimed in this case that the amount of oil under Andreae's entire forty was only 25,000 barrels, worth probably half the cost of drilling a well. The Millette case did not make the prudent operator rule inapplicable to any case except one with analogous facts to it, which is not this case. There was no evidence of bad faith on Monsanto's part. It tried to have exploration made in the southern area to discover whether there was oil

there, and in order to do so gave up six of its leases and thereby induced the drilling of a well offsetting Andreae's property to the west. In the oil business, and in determining the rights of people, there must be some guide by which to go. The guide developed through the decades is the prudent operator rule. It is essential as a standard, just as the conduct of a reasonably prudent man is essential in negligence cases. It is shown without doubt that a prudent operator would not have drilled on Andreae's forty.

■■ ■ There is another question involved. As shown by the Millette case, the drainage must be substantial, and the question is, what is a substantial drainage? Substantial is a relative term and the meaning of it is to be determined with regard to all of the surrounding facts and circumstances. ■■ ■ In this case, it is shown beyond question that to recover the oil under Andreae's lease would have cost more than it was worth. Suppose Monsanto had surrendered the lease to Andreae on first contact. Andreae could not have done anything with it. If he had drilled to recover the amount of oil there he would have lost money. Under this circumstance, we do not think there was any substantial drainage.

For the reasons aforesaid, this case is reversed and judgment entered here for appellant.

Reversed and judgment here for appellant.

*McGehee, C. J., and Lee, Kyle, Gillespie and Rodgers, JJ.,* concur. *Arrington and Ethridge, JJ.,* took no part. *McElroy, J.,* dissents.

## DISSENTING OPINION

McElroy, J.

With deference, I am compelled to dissent. After a careful reading of the opinion in this case I believe it

is an attempt to overrule the Millette cases, or at least to circumvent them.

The facts are accurately stated in the majority opinion, so I will not repeat except to say that Monsanto obtained 9,375 barrels of oil at $2.70 per barrel, and Andreae obtained 585.9 barrels at the same price. The record, therefore, shows that Monsanto is enriched by $25,327.50, and Andreae is poorer by $1,581.93. The majority opinion states: "In the oil business, and in determining the rights of people, there must be some guide by which to go. The guide developed through the decades is the prudent operator rule. It is essential as a standard, just as the conduct of a reasonably prudent man is essential in negligence cases. It is shown without doubt that a prudent operator would not have drilled on Andreae's forty."

The drainage of the Andreae land was from the Ainsworth well located on the forty just north. The test well drilled by Reeves was on the west forty, next to Andreae's forty. In other words, no test well was drilled on Andreae's acreage, and no well was attempted to be drilled because no one was willing to drill there — not even Andreae. They said Andreae smiled when offered the chance to drill. It might have been because Andreae did not have the amount of money necessary to drill a well. Monsanto held his lease, and had not given it up as far as Andreae was concerned. As I understand it, appellant requests this Court to overrule the cases of Millette v. Phillips Petroleum Co., 209 Miss. 687, 48 So. 2d 344 (1950), and Phillips Petroleum Co. v. Millette, 221 Miss. 1, 72 So. 2d 176 (1954). These cases repeat the rule of law that there is an implied covenant in oil and gas leases that the lessee will "refrain from depleting the lessor's mineral interests by an affirmative act of the lessee." In the first Millette case, the Court said:

"There is an implied covenant in a lease of oil property that the lessee will do nothing to impair the value of the lease, and must use reasonable care to protect lessor from damages or loss by the affirmative act of such lessee." See Wells v. Continental Oil Co., (Miss.), 142 So. 2d 215.

The Court also said: "This implied obligation has been extended to include, in the absence of express stipulation, a duty to drill offset wells if practicable and profitable. . . . . This responsibility is separable from a duty to drill offset wells, and an express covenant which absolves the lessee from this method of development does not relieve the lessee of liability for substantial drainage by him. . . . . By these he purchases the right to delay actual development, but not an acquittal of such obligations as are read into the lease by mutual understanding, equitable necessity or public policy."

In the second Millette case, the Court said: "It is contrary to every concept of equity and justice to hold that a lessee may drill on adjoining land and through such a well drain dry the land on which it refuses to drill and thereby deplete the resources of its lessor and enrich itself to that extent without the expenditure of one dime in developing the lessor's land *and then refuse to pay the lessor the royalty for his oil which it has taken from him.* It is not only contrary to equity and justice but is contrary to the express royalty provision in the lease here involved that appellant would pay the one-eighth royalty on the oil 'produced and saved from said land'." (Emphasis supplied).

They hold that the acceptance of delay rentals does not per se estop the appellants to claim damage by way of waste caused by drainage through the affirmative action of the lessee. They emphasize that the option to defer actual drilling by the payment of annual delay rentals affects only the specific right which such rentals

are designed to purchase. The acceptance of such rentals is relevant solely to the duty to drill, and does not compensate for waste or depletion. Under this form of lease, the lessor may drill a well or pay rentals, but on the other hand, he must prevent drainage or pay the lessor damages.

The second Millette case, as to the so-called prudent operator rule, points out"... that the duty to drill offset wells, as expressly stipulated and limited in the lease, is separable from the implied covenant to compensate for drainage and that the latter survives unimpaired. ... ... The so-called 'prudent operator' rule has no application to a state of facts such as here presented. .... The 'prudent operator' rule has its place in those cases involving the duty to drill an offset well under an implied covenant where not expressly provided for in an oil and gas lease, and it is usually inserted in leases where the duty to drill offset wells is spelled out in the lease, such as the lease in the present case. But notwithstanding the fact that the rule has no place in a suit for recovery for compensation for drainage by a common lessee from one tract of land through a well drilled on an adjoining tract, the duty to drill offset wells and the duty to compensate for drainage being entirely separate, *some courts have extended the rule to apply to suits for drainage.* We decline to follow the rule as laid down by such courts. It is contrary to every concept of equity and justice to hold that a lessee may drill on adjoining land and through such a well drain dry the land on which it refuses to drill and thereby deplete the resources of its lessor and enrich itself to that extent without the expenditure of one dime in developing the lessor's land *and then refuse to pay the lessor the royalty for his oil which it has taken from him.* It is not only contrary to equity and justice but is contrary to the express royalty provision in the lease here involved that appellant would pay the one-eighth royalty on the

oil 'produced and saved from said land.' It is wholly beside the point to argue that appellant might have to pay to the lessor of the adjoining land a one-eighth royalty on all the oil which is produced from the well located on his land. Assuming, but without deciding, such to be true, and assuming, but without deciding, that appellant might thereby have to pay a double royalty on a part of the oil produced from the well located on the adjoining land, the appellant is certainly in no position to complain of our holding, since it has saved unto itself the cost of drilling on appellees' land, and that saving is considerably more than the additional royalty which it might be required to pay." (Emphasis supplied).

Therefore, in the Millette cases, we may ask the question: Is there anything inconsistent in the trial court's finding that there was not a substantial quantity of oil underlying the lessor's land to justify the drilling of an offset well, and then award damages for the drainage complained of? My understanding is that under the opinion of the Court drainage which is not considered a "sufficient quantity of drainage" measured by the prudent operator's test to justify the drilling of an offset well under the express covenants so to do is considered substantial drainage; and in order to justify an award under a breach of the implied covenant to compensate for drainage, the drainage must be caused by an affirmative act of the lessee.

My conclusion is that the Mississippi decisions dealing with implied covenants establishes the fact that there exists in oil and gas leases an implied covenant for development of the leased premises; that the remedy for failure to develop is forfeiture after lessee has had notice and a reasonable time in which to develop; to compensate for drainage where the drainage has been caused by an affirmative act of the lessee; and that the implied covenant to compensate for drainage is entirely separate from the express covenant to drill offset wells

under the prudent operator's test. The appropriate remedy in such a suit is damages. See Miss. Law Journal, Vol. 26, p. 28, Interpretation of Oil and Gas Leases, by Arthur B. Custy.

Chap. 256, Sec. 1, Laws 1948, is as follows: "It is the intent and purpose of this law to permit each and every oil and gas pool in Mississippi to be produced up to its maximum efficient rate of production, subject to the prohibition of *waste* as herein defined, and subject further to the enforcement and protection of the co-equal and correlative rights of the owners of a common source of oil and gas, so that each common owner may obtain his just and *equitable* share of production therefrom." (Emphasis supplied).

Quoting from the majority opinion in the case at bar, it is said: ". . . . the drainage must be substantial, and the question is, what is a substantial drainage? Substantial is a relative term and the meaning of it is to be determined with regard to all of the surrounding facts and circumstances. In this case, it is shown beyond question that to recover the oil under Andreae's lease would have cost more than it was worth. Suppose Monsanto had surrendered the lease to Andreae on first contact. Andreae could not have done anything with it. If he had drilled to recover the amount of oil there he would have lost money. Under this circumstance, we do not think there was any substantial drainage."

In answer to this, we might say that Andreae's total of $1,581.93 to be recovered, that is, 585.9 barrels at $2.70 per barrel, may not be considered substantial. However, we must remember that Monsanto drained 9,375 barrels from this pool of oil on Andreae's property. This amounts to $25,327.50, in which Monsanto was the richer, and $1,581.93, in which Andreae was the poorer. The facts in this case show that Monsanto did not spend one dime in trying to develop the lands of Andreae. It is true that he farmed out for a test well to

Reeves on the adjoining property, but this proved to be a dry hole. The lower court held that Andreae was entitled to $1,581.93, and showed that Monsanto recovered $25,327.50, which was much less than a well would have cost on Andreae's property. Therefore, to have paid Andreae the amount to which he was entitled, although it may not appear to be substantial, it was certainly substantial as far as saving Monsanto money in having to drill a very expensive well in which to help him; and since we are under the equitable rule that he must not drain without due compensation, and there is proof of drainage from Andreae's property, I believe the case should be affirmed.