257 So.2d 488 (1971)
SHELL OIL COMPANY et al.
v.
Fannye M. JAMES et al.
No. 46336.
Supreme Court of Mississippi.
November 22, 1971.
Rehearing Denied February 15, 1972.
*490 Brunini, Everett, Grantham & Quin, John M. Grower, John R. Hutcherson, Jackson, Vernon L. Terrell, Jr., New Orleans, for appellants.
Wells, Wells, Marble & Hurst, W. Calvin Wells, Jr., J. Jerry Langford, Jackson, Crymes Pittman, Luther David Pittman, Raleigh, for appellees.
*489 RODGERS, Presiding Justice:
Fannye M. James, as guardian of the estates of Kenneth Ray James and Larry Kennon James, minors, and certain other named adults, together with Mineral Springs Baptist Church, brought suits in the Chancery Court of Smith County, Mississippi, against certain named adult citizens and the oil companies named, including the Shell Oil Company of Delaware. The complainants in the original bill sought to recover damages from the defendants for the breach of an implied covenant to protect the lessors named in the original bill from the drainage of oil from the lands of the complainants.
The record reveals that Fannye M. James acting as guardian for two minors, executed an oil, gas and mineral lease covering 200 acres of land to Pure Oil Company. A one-half interest in the James Lease was assigned to Shell Oil Company, and by agreement Shell Oil Company became the operator for and on behalf of the other oil companies.
No issue is raised as to the validity of the lease nor as to the assignments.
The land covered by the Fannye James lease is described as:
SW-1/4 of the SW-1/4 of Section 5, the East 1/2 of the SW-1/4 of Section 5 and the N-1/2 of the NW-1/4 of Section 8, T-1-N, R-9-E.
The particular land here involved is hereafter referred to as "subject land" and is described as E-1/2 of SW-1/4 of Section 5. The SW-1/4 of SW-1/4 of Section 5 is made a part of the lawsuit because it was "pooled" with the NW-1/4 of SW-1/4 of Section 5 into an 80-acre drilling unit as required by the State Oil and Gas Board's Special Rules for the so-called Tallahala Creek Field. The NW-1/4 of SW-1/4 of Section 5 is also mentioned in this lawsuit because Shell Lane No. 4, located in that 40-acre block is said to be draining oil and gas from the NE-1/4 of SW-1/4 of Section 5.
The lower or southern eighty acres of the 200-acre Fannye James lease (the N-1/2 of NW-1/4 of Section 8) is not involved in the lawsuit other than as a part of the lease. It is contended by Shell Oil Company that it is obligated to protect from drainage under the "Prudent Operator Rule" the entire lease and not in 80-acre drilling units as set up by the Mississippi Oil and Gas Board. At the request of Shell Oil Company, the Mississippi Oil and Gas Board previously established 80-acre drilling units in the Tallahala Creek Field because of the alleged permeability of the oil sand. The property of the lessors here involved (E-1/2 of the SW-1/4 of Section 5) is a complete unit, north and south, as was established by the Oil and Gas Board. The order of the Oil and Gas Board also established another 80-acre drilling unit west of the property here involved described as the W-1/2 of the SW-1/4 of Section 5. The south forty of this unit (W-1/2 of the SW-1/4 of Section 5) belonged to Fannye James' wards. The north forty of the west unit described as the W-1/2 of the SW-1/4 of Section 5 belonged to Mrs. E.M. Lane. This is important to remember because the oil well located in the Lane forty is the well said to be draining oil from the NE-1/4 of the SW-1/4 of the Fannye James east unit.
The witnesses agree that there is a fault running through the James unit and continuing west along the center line of *491 the west unit between the NW-1/4 of the SW-1/4 and the SW-1/4 of the SW-1/4 so that most of the oil-bearing sands are said to be in the Lane north forty of the west unit. There is a small amount of oil-bearing sand located on the north side of the James south forty in the west unit. It is also agreed that the oil sand north of the fault line is a completely separate fault block from the oil sand located south of the east and west fault line; consequently, Shell Oil Company does not contend that the oil well located on the east Fannye James unit (James No. 1 now depleted) was intended to be an offset well, because the James Unit No. 1 was in another fault block.
The appellants suggest, on appeal, that the Chancellor erred upon the trial of this case, in (1) holding that the implied covenant in their lease requiring them to protect the leased premises from drainage was violated; and (2) that the appellants did not act in good faith; therefore, it is said, the Chancellor erred in awarding damages against the appellants.
The first proposition to determine is whether or not either of the two wells, Lane No. 1 or Lane No. 4, was in fact draining oil from the NE-1/4 of the SW-1/4 of Section 5, and, if so, whether or not such drainage was in sufficient quantities so as to have made it economically feasible to have drilled a well on the north forty (NE-1/4 of the SW-1/4) of the east unit. If this issue is answered in the affirmative, we must determine whether or not the appellants acted as reasonable and prudent operators, under the circumstances, in refusing to drill. If the appellants did not so act, they are liable for the amount of the drainage, unless it can be said that there was sufficient counter-drainage to compensate the appellees for their loss.
The record reveals that one of the complainants, L.C. Duckworth, gave notice to Shell Oil Company on July 15, 1968, that drainage was taking place on the north forty of the east unit. He requested Shell Oil Company to drill or "drop the lease" on the NE-1/4 of the SW-1/4 of Section 5. Shell replied that drainage from the property was adequately protected and refused to drill or to release the leasehold.
The testimony shows that there are three layers or formations of oil sand mentioned by the witnesses, they are: Cotton Valley HH Sand, the Smackover II Sand, and the Middle Smackover Sand. The Chancellor determined that there was no oil production shown by the evidence in the Middle Smackover on the Lane side of the fault.
It is the contention of the complainants, appellees here, that they established by their witnesses that there is more than sufficient oil in the Cotton Valley HH Sands and Smackover II Sands located on the NE-1/4 of the SW-1/4 of Section 5 to justify an offset well, and that such well would produce in paying quantities. On the other hand, Shell Oil Company maintains that there is no oil in the Smackover II Sand and that there is not sufficient oil in the James drilling unit to require Shell, under the Prudent Operator Rule, to drill an offset well. Shell admits, however, that there are approximately eight and one-half acres of oil in the Cotton Valley HH Sand under the NE-1/4 of SW-1/4, Sec. 5, T-1-N, R-9-E, and that the oil and gas in this area are being drained away. The parties stipulated that the price of oil during the period from the discovery of the Tallahala Creek Field until the time of the trial was $3.12 per barrel. They agreed that if a request had been made to the Mississippi Oil and Gas Board requesting a permit to drill a well in the NE-1/4 of SW-1/4 of Section 5, the permit would have been granted.
The complainants offered two expert witnesses to prove their case. They were Mr. Harold Karges and Mr. Leo Hines. Mr. Karges is a consulting petroleum geologist and Mr. Hines is a consulting petroleum engineer, both of Jackson, Mississippi. *492 Mr. Karges pointed out that there is no fault between the north forty of the east unit (E-1/2 of SW-1/4 of Section 5) and the Shell Lane No. 1, located in the SE-1/4 of the NW-1/2 of Section 5, and Shell Lane No. 4 well, located in the north forty of the west unit (W-1/2 of SW-1/4 of Section 5).
Mr. Hines made several calculations of oil in place on NE-1/4, SW-1/4, Section 5 and calculated recovery percentage and total amount of drainage. He used several dates in time in making his determinations. Mr. Hines based his calculations upon answers given by Shell Oil Company in interrogatories propounded by the complainants and data furnished by Mr. Karges, complainants' consulting geologist.
Mr. Hines arrived at the following conclusion:
The total value of the oil and gas drained from the Fannye James lease and the Cotton Valley HH Sand and the Smackover II sand from the dates on which the Fannye James No. 1 well ceased to produce in those zones to December 1, 1969, is $454,292.00, of which $56,787.00 is royalty. By adding to those amounts the future drainage in the two zones, the ultimate value of the oil and gas at depletion is $749,332.00, of which $93,668.00 is royalty.
The defendants offered the testimony of Mr. John Mc McLain, a Shell staff petroleum engineer; Dr. James A. Hartman, Shell's Division Engineer; Mr. Brian Ausburn, who is Shell's senior petrophysical engineer and a section leader of the petrophysics section for onshore production division, including Tallahala Creek Field; Mr. Neil J. Richter, Shell's reservoir engineer; and Mr. Allen Jackson, a consulting geologist from Hattiesburg, Mississippi.
Mr. McLain testified that Shell protected the drainage from the complainants' land, because, it is said, the Fannye James lease is a 200-acre lease and is compensated by counter-drainage since the SW-1/4 of the SW-1/4 of Section 5 is within the same production unit as Shell Lane No. 4 located in the NW-1/4 of SW-1/4, Section 5.
Dr. James Hartman testified that there was no Smackover II Sand under the James lease because of a "bald high".
Mr. Neil J. Richter testified that under the NE-1/4 of the SW-1/4, Section 5, there were 23,715 barrels of oil and that a fifty percent (50%) participation of the Fannye James lease in Shell Lane No. 4 well amounted to participation in a well of 338,488 barrels of oil or 14 times as much oil as can be drained from the NE-1/4 of the SW-1/4, Section 5.
The thrust of the defense by Shell is the contention that an undue amount of oil was allowed the Fannye James lease from the oil produced in the NW-1/4 of the SW-1/4, Section 5, the Lane No. 4 well. Shell contends that there is in fact no breach of the implied covenant to protect the lessors from drainage or to refrain from depletory acts in the NE-1/4 of the SW-1/4 of Section 5, when their effort to protect the entire 200-acre Fannye James lease is examined and brought into perspective. They say that Shell expended $1,500,000.00 in drilling three wells on the James lease and that this expenditure satisfied their obligation "to act as a prudent operator having due regard to the interest of both the lessor and the lessees." Shell claims that its effort to protect and develop the Fannye James lease was "fair, prudent and reasonable". They contend that the James lease was getting more than its share of the oil and gas because of counter-drainage into Shell Lane No. 4 where the lessors have a fifty percent (50%) interest. Moreover, it is contended that the calculations of Mr. Hines were based upon questionable dimensions and that his conclusions as to the total drainage are erroneous.
On the other hand, the appellees (lessors) point out that the Mississippi Oil and Gas Board has been given power to protect the co-equal and correlative rights of the *493 lessors of oil and gas in a common pool. In order to carry out this function the Board, at Shell's request, has set up 80-acre drilling units for the Tallahala Creek Field running north and south. It is, therefore, contended that the lessee of the 80-acre drilling unit (E-1/2 of SW-1/4 of Section 5) should have drilled an offset well in the north forty of this 80-acre unit because it knew there was drainage from the NE-1/4 of the SW-1/4 of Section 5, and that there were "substantial" oil and gas under this forty-acre block.
In order to establish its activity as a prudent operator with reference to the land here involved (NE-1/4 of the SW-1/4, Section 5) Shell has gone to some length to show how many wells it has drilled east, north and south of the subject forty acres. It then claims that since the Fannye James lease covers two hundred acres of land, its activity on other parts of the leased land on the oil pool should be considered in determining whether or not as a prudent operator it should have drilled on the subject land.
We cannot agree with this contention for the following reasons. The Mississippi State Oil and Gas Board was established for the purpose, among other things,
"* * * [T]o safeguard, protect and enforce the co-equal and correlative rights of owners in a common source or pool of oil and gas to the end that each such owner in a common pool or source of supply of oil and gas may obtain his just and equitable share of production therefrom * * *." Sec. 6132-01, Miss.Code 1942 Ann. (1952).
The Board has been given express jurisdiction over all persons and property necessary to carry into effect the purpose of the authority granted to it by the Legislature. In order to protect the natural resources of this State and to prevent waste, the Board is authorized to regulate the spacing of wells and to establish drilling units (Sec. 6132-01, supra).
The Board is authorized, "(13) To prevent, so far as is practicable, reasonably avoidable drainage from each developed unit which is not equalized by counter-drainage." Sec. 6132-10, Miss.Code 1942 Ann. (Supp. 1971).
In Paragraph (c) (11) of the above Section 6132-10, Mississippi Code 1942 Annotated (Supp. 1971) the term "drilling unit" is used by the Legislature; and in Paragraph (c) (13), supra, the term "developed unit" is used. These terms are defined in Section 6132-08, Mississippi Code 1942 Annotated (1952) as follows:
"(1) `Drainage unit' or `drilling unit' shall mean the maximum area in a pool which may be drained efficiently by one well so as to produce the reasonable maximum recoverable oil or gas in such area.
"(m) `Developed area' or `developed unit' shall mean a drainage unit having a well completed therein which is capable of producing oil or gas in paying quantities."
The State of Mississippi is not only interested in safeguarding the "co-equal and correlative rights of owners" but the duty to prevent waste of natural resources is delegated, in part, to the Mississippi Oil and Gas Board. It is the duty of the Board to determine the number of acres that may be effectively drained by a well under the circumstances existing in the area and to establish drilling units. (Section 6132-21, Miss.Code 1924 [Supp. 1971]). Moreover, the Board is directed to prevent "net drainage from each developed unit (that is, drainage which is not equalized by counter-drainage) so that each owner in a pool shall have the right and opportunity to recover his fair and equitable share of the recoverable oil and gas in such pool." (Sec. 6132-21(a), supra).
In the instant case, the Oil and Gas Board established 80-acre drilling units so that the E-1/2 of the SW-1/4 of Section 5 is one unit and the W-1/2 of the SW-1/4 of *494 Section 5 is another unit. The complainants participated in the royalty received from the W-1/2 of the SW-1/4. This participation was allowable because of the authority expressed in Section 6132-21(d), Mississippi Code 1942 Annotated (Supp. 1971), wherein it is said:
"* * * [A]ny allocation or apportionment of production shall be made on the basis of and in proportion to the acreage content of the drilling units prescribed for the producing horizons for the pool, so that each such prescribed unit shall have equal opportunity to produce the same daily allowable, * * *."
It was stipulated by the parties that the Board would have granted a permit to the lessor to drill in the NE-1/4 of the SW-1/4, Section 5, if the lessor had requested it. We are, therefore, of the opinion that the trier of facts was not required to take into consideration the activity of the lessee on the entire 200-acre tract under lease from the appellees in determining whether or not the lessee was duty bound, by its implied covenant, to explore further "the leasehold in each separate drilling unit." We are of the opinion that the expressions "net drainage" and "counter-drainage" mentioned in the Code (Section 6132-21(a), Miss.Code 1942 Ann. [Supp. 1971]) apply to each separate "developed unit" as established by the order of the Oil and Gas Board.
The appellants, Shell Oil Company, et al., contend that they should not have been required to drill (or "drop") the lease on the subject land because there was not a substantial amount of oil involved, and that there are only 23,715 barrels of oil under the subject land so that a prudent operator could not profitably drill. Shell further contends that the appellees are receiving a one-half interest in the royalties from the Lane 4 well located in the NW-1/4 of the SW-1/4 of Section 5, and that this well will more than compensate appellees for their loss in drainage from the NE-1/4 of the SW-1/4.
The appellant admits that oil is being drained from the NE-1/4 of the SW-1/4 by Lane 4, located in the NW-1/4 of the SW-1/4, and Lane 1, located in the SE-1/4 of the NW-1/4, all in Section 5, T-1-N, R-9-E. Shell Oil contends that there are only eight and one-half acres of Cotton Valley HH Sand located under the subject land of the appellees. On the other hand, the witnesses for the appellees contend that the fault line runs east and west along the line between the NE-1/4 of the SW-1/4 and the SE-1/4 of the SW-1/4 of Section 5 so that there are almost 40 acres of oil-bearing sand in the NE-1/4 of the SW-1/4. They also contend that there is oil in the Cotton Valley HH Sand and in the lower Smackover II Sand. This conflict of evidence was for the determination of the trial court and we cannot say from the evidence in this case that the Chancellor was in error in determining that there was substantial drainage of subject land.
This brings us to the legal aspect of the instant case and to the appellants' defense that defendants are not liable to the appellees, complainants, because appellants acted in good faith and were not required by their implied covenant in their lease to drill a well in the NE-1/4 of the SW-1/4 of Section 5, T-1-N, R-9-E. Specifically stated, appellants contend that there was not sufficient oil in place on the above forty acres to justify the cost of drilling. Moreover, it is said, appellees are already getting more than their fair share of the oil in the Lane fault by reason of counter-drainage. We have attempted to deal with the counter-drainage claim above in this opinion and now we deal with the "Prudent Operator" defense.
We are here dealing with an oil and gas pool three miles deep in the earth. This pool of oil is located under the property of many surface landowners. When the pool of oil has been penetrated by a recovery well the oil and gas located in the pool move from a high pressure area to a low pressure area so that the oil and gas migrate from the property of one landowner *495 to another. This exodus is called drainage. The migratory proclivity of oil and gas has caused considerable concern in the field of law in an effort to adjust common law rules of land surface law to the migratory oil and gas which were originally in place under the land of a surface owner. The old rule of capture permitted one surface owner to drain oil from under the land of his neighbor. 1 Summers Oil & Gas, § 63 Perm.Ed. 1959. But, see Phillips Petroleum Co. v. Millette, 221 Miss. 1, 72 So.2d 176 (1954). Of course, the neighbor has every right to drill on his land and compete with others for the capture of oil and gas in a pool under his land. At this point the law attempts to adjust surface land ownership to this situation. The courts hold uniformly that there is an implied covenant on the part of the lessee to drill wells offsetting producing wells on adjoining lands where these wells are draining a substantial amount of oil from the lessors' land. Phillips Petroleum Co. v. Millette, supra; U.C.L.A. Law Rev. 508; Anno. 19 A.L.R. 436 (1922).
The lessee is under an implied obligation in the absence of an express agreement to protect the land premises from drainage by wells on adjacent property by others and to exercise reasonable diligence and care of an ordinary prudent person to prevent the drainage. Millette v. Phillips Petroleum Co., 209 Miss. 687, 48 So.2d 344 (1950); Phillips Petroleum Co. v. Millette, 221 Miss. 1, 72 So.2d 176 (1954); and Monsanto Chemical Co. v. Sykes, 245 Miss. 207, 147 So.2d 290 (1962); 58 C.J.S. Mines and Minerals § 202, p. 477 (1948).
Ordinarily a lessee will not be required to drill a well to protect the lease from the drainage by a third party if it is shown that the leased land does not have "substantial oil and gas" in place under the land of the lessor so as to return a profit to the leaseholder. Myers v. Shell Petroleum Corporation, 153 Kan. 287, 110 P.2d 810 (1941); Stanolind Oil & Gas Co. v. Sellers, C.A.Okl., 174 F.2d 948 (1949).
On the other hand, a lessee cannot refuse to drill on property on which he has a lease and at the same time drain oil from the leased property through a well on property adjacent to the leased property, but on land belonging to another surface owner, without compensating the lessor for the oil and gas taken from the other leasehold. The lessee, by his own original contract of leasehold, owes the lessor for the oil and gas taken by him from the leasehold in an off-property drainage operation. Phillips Petroleum Co. v. Millette, 221 Miss. 1, 72 So.2d 176 (1954). In such a situation the lessee may drill an offset well or he may elect to pay the lessor for oil and gas taken from his land. If there is "substantial" oil or gas under the land in question the lessee is required to "drill or drop" the lease.
We quoted from Hughes v. Busseyville Oil and Gas Co., 180 Ky. 545, 203 S.W. 515, 518 (1918), in the Millette case, supra, wherein the Court used the following language:
"From these authorities we conclude there is an implied obligation on the part of an oil and gas lessee to refrain from taking any affirmative course of action which will result in draining a substantial quantity of the oil and gas from the lessor's property and producing the same through the lessee's well on adjacent premises belonging to a different lessor. * * *" 221 Miss. at 21, 72 So.2d at 181.
In the instant case the Pure Oil Company secured a lease from Fannye James acting as guardian for Kenneth Roy James and Larry Kennon James, minors, on the 30th of June, 1964. Later the lessors signed a corrected lease and Orrin C. James, Charles B. James and Lex H. James were also added as lessors. One-half interest in the James lease was assigned *496 to Shell Oil Company on February 20, 1967. These leases contained the agreement that:
"3. The royalties to be paid by lessee are: (a) on oil, one-eighth (1/8) of that produced and saved from said land."
Shell Oil Company by agreement with the leaseholder, Pure Oil Company, drilled the wells north and west of the subject land, one or both of which drained "produced and saved" oil from the land of the lessors for which the lessors are entitled to recover one-eighth royalty.
We cannot say from the evidence in this case that the Chancellor was in error in holding that there was a "substantial" amount of oil in paying quantities under the property of lessors in the NE-1/4 of the SW-1/4, Section 5, T-1-N, R-9-E, so that the lessees should have either drilled on this forty or they should have released it from their lease. Moreover, the Chancellor was the judge of the weight and worth of the conflicting evidence.
The testimony in this case, though conflicting, is clear, and leads us to the inescapable conclusion that the Chancellor was correct as nearly as one can be from the testimony of expert witnesses in an inexact science.
We are also of the opinion that our holding under the facts in Phillips Petroleum Co. v. Millette, 221 Miss. 1, 72 So.2d 176 (1954), is applicable to the facts in this case, and that the case of Monsanto Chemical Company v. Andreae, 245 Miss. 11, 147 So.2d 116 (1962) is not applicable here because the evidence here shows a "substantial amount" of oil and gas in place under the land here involved.
The decree of the Chancery Court will be affirmed.
Affirmed.
PATTERSON, SMITH, ROBERTSON and SUGG, JJ., concur.