Jimmie COOK, a single woman,
Plaintiff-Appellee,

v.

EL PASO NATURAL GAS COMPANY, a Delaware Corporation, and Phillips Petroleum Company, a Delaware Corporation, Defendants-Appellants.

No. 76–1370.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 17, 1977.

Decided Aug. 3, 1977.

---

Don M. Fedric of Hunder-Fedric, P.A., Roswell, N.M., for plaintiff-appellee.

W. Thomas Kellahin of Kellahin & Fox, Santa Fe, N.M. (Owen M. Lopez of Montgomery, Federici, Andrews & Hannahs,

Santa Fe, N.M., on the brief), for defendants-appellants.

Before LEWIS, Chief Judge, and BREITENSTEIN and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

■ In this action the question is whether the plaintiff, who owns a five percent overriding royalty interest in an oil and gas lease, is entitled to recover a compensatory royalty on the basis that the defendants who own a gas well which is located on an adjoining lease have drained gas from a lease under which plaintiff has the five percent overriding royalty interest.

The case was first filed in the State District Court for New Mexico, Eddy County. The defendants, El Paso Natural Gas Company and Phillips Petroleum Company, petitioned for removal to the United States District Court for the District of New Mexico, where the case was tried to the court on December 15, 1975. Judgment was entered for plaintiff-appellee on February 25, 1976.

Mrs. Cook was the owner of a United States Oil and Gas Lease in which the legal description is the W½ of Section 29, Township 23 South, Range 31 East, N.M.P.M., Eddy County, New Mexico. She assigned this lease to Phillips Petroleum Company on June 26, 1964, reserving a five percent overriding royalty. In the lease there was a so-called potash stipulation which provided that no wells would be drilled for oil or gas at a location which, in the opinion of the Oil and Gas Supervisor of the Geological Survey, would result in undue waste of potash deposits or would constitute a hazard to or an undue interference with mining operations being conducted for the extraction of potash deposits.

On November 1, 1971, Phillips assigned to El Paso an interest in the lease covering the description mentioned. On February 12, 1973, El Paso completed a well in the E½ of Section 29. This was called the Mobil Federal Well No. 1. The proration unit assigned to the well by the New Mexico Oil Conservation Commission consisted of the E½ of Section 29. El Paso sought to increase the proration unit to 640 acres which would have included both the West Half and East Half of the Section. This would have embraced the lease of plaintiff-appellee, Mrs. Cook (which lease was assigned, as noted above, to Phillips Petroleum Company).

On May 8, 1974, the United States Geological Survey determined that oil and gas drilling operations to a depth sufficient to test the so-called Morrow formation underlying the W½ of Section 29 would result in undue waste of potash and would constitute a hazard to future potash mining. It entered an order prohibiting the drilling of an oil or gas well on the W½ of Section 29.

At the conclusion of the trial both sides submitted proposed findings of fact and conclusions of law. The trial court ruling for plaintiff-appellee made findings of fact and conclusions of law in which it determined that: the Mobil Federal No. 1 Well was some 660 feet from the East line of the lease which plaintiff had owned covering the W½ of Section 29; thereafter, production was commenced on the Mobil Federal Well on March 22, 1973, and on May 8, 1974, the United States Geological Survey (USGS) issued its prohibition against the drilling of a well on the W½ of Section 29. The court also found that the Morrow gas pay zone reservoir for the Mobil Federal No. 1 Well extended into the W½ of Section 29, whereby this underground area was contributing approximately 26% of the gas contained in the Morrow gas pay zone reservoir for the Mobil Federal No. 1 Well.

The court further found that the Mobil Federal No. 1 Well was draining gas in substantial quantities from the underground area beneath the W½ of Section 29.

The court concluded that since the law implies a duty on an oil and gas lessee to protect the leased premises from offsetting adjoining land drainage of oil and gas, and since this is a covenant which runs with the land and the owner of an overriding royalty interest has standing to invoke the implied covenant to protect against drainage, and where a common lessee exists for two abutting oil and gas leases, the common lessee is

obligated to protect its lessor from oil and gas drainage from a well located in the other lease. This is not controlled or limited by the test as to whether a reasonable prudent operator would in the circumstances drill an offset well.

The court further concluded that the common lessee is under a duty to prevent drainage regardless of whether or not the drilling of an offset well on nonproducing land would satisfy the standards of the prudent operator rule.

A further conclusion of the trial court was that the defendants-appellants as common lessees under separate leases covering the E½ and W½ of Section 29 were under a duty to the plaintiff to protect her interest in the oil and gas under the W½ of Section 29 against drainage from the defendants' Mobil Federal No. 1 Well, located in the E½ of Section 29.

The court's next conclusion was that the plaintiff had not waived her rights to protection from drainage as a result of the existence of a potash stipulation nor by reason of the USGS prohibition against a well being drilled.

Nor did she waive or disclaim her rights by assigning her lease to Phillips Petroleum Company.

The terms of the lease do not circumscribe plaintiff's right to be protected from drainage.

The payment of compensatory overriding royalty as an alternative to the drilling of an offset well where the interest owner is suffering losses as a result of drainage is appropriate.

The court finally concluded that as a result of the governmental prohibition, an offset well cannot be drilled upon the W½ of Section 29. However, the alternative compensatory remedy is available to her and for that reason she is entitled to judgment.

The contentions of the defendants-appellants are:

First, that any right which plaintiff may have had to a compensatory royalty was nullified by the government prohibition issued by the Geological Survey.

Second, that the express drainage covenant in the plaintiff's lease nullified any implied covenant to protect plaintiff's leasehold from drainage.

Third, that appellants' duty to protect the first lease from drainage resulting from the drilling of a well on the second is limited to the duty imposed upon a reasonably prudent operator.

Fourth, that El Paso and Phillips maintain that they have no duty to protect Mrs. Cook's leasehold from drainage of oil and gas by the drilling of a well on an adjoining leasehold absent the lessor's leasehold being capable of producing oil or gas in quantities sufficient to repay the appellants the cost of drilling, equipping and operating such a well at a reasonable profit.

Fifth, plaintiff is precluded, as an overriding royalty interest owner, from invoking the implied covenant to protect against drainage.

## I.

The thrust of the first argument of the appellant companies is that the government prohibition against drilling in the W½ of Section 29, the purpose of which was to protect potash deposits under that section, had the effect of excusing performance of any contractual duty including the implied covenant to protect appellee from drainage of the defendants-appellants, and that it was not limited to excusing the drilling of an offset well in the W½ of Section 29. They maintain that compensatory royalties need only be paid when there is an obligation, either express or implied, to drill an offset well and since the government prohibited the drilling of a well in the W½, the argument goes, there can be no further obligation to perform the covenant to drill an offset well nor can there be an obligation to respond to an implied covenant to protect the plaintiff-appellee from drainage. To accept this argument is to determine that all performance by defendants-appellants is excused.

■ Contractual performance can indeed be excused where the intervention of a government regulation or law makes performance impossible. *See Thomas v. Pavletich*, 31 N.M. 76, 239 P. 862 (1925). In recognizing also that spacing regulations can render a covenant to drill a second well inoperative, *Thompson v. Greer*, 55 N.M. 335, 233 P.2d 204 (1951), it does not follow that this vitiates all other alternative remedies. The result of acceptance of this argument is to give appellant companies a license to drain the gas from the area under the plaintiff-appellee's assigned lease without paying a royalty—all because the government has prevented the drilling of a well. It would be grossly inequitable to confer such windfalls. It is difficult to see how a prohibition against drilling (governmental intervention) can excuse the party draining gas under another's land from compensating that person for the gas being so taken.

The case of *Pan American Petroleum Corporation v. Udall*, 192 F.Supp. 626 (D.D.C.1961), furnishes clarification as to the nature of the compensatory royalty. It was there explained that:

> In the oil industry compensatory royalties are royalties paid to a landowner whose land lies adjacent to a producing well, but on whose land no well has been drilled. They are intended to compensate the landowner for losses suffered due to subterranean drainage of oil from his land resulting from the adjacent producing well. They are an alternative to the drilling of a so-called "offset well" to recover the oil before it drains away.

192 F.Supp. at 628. The court went on to rule that the compensatory royalties which had been assessed by the Department of the Interior in that case were arbitrary. The court did acknowledge that some compensatory royalties in a reasonable amount were due. The cause was remanded for redetermination of the amount of royalty.

■ Appellants rely on this court's decision in *Ashland Oil & Refining Co. v. Cities Service Gas Co.*, 462 F.2d 204 (10th Cir. 1972). But in *Ashland* we held that where there is impossibility of performance with respect to one of two alternatives, the result is not to relieve the promisor of all obligation in the premises. He does not escape performance of an alternative remedy if one exists. Citing a number of cases at page 211 which hold that the impossibility of one mode of performance does not discharge the obligation to perform on the alternative basis, and also the note in 84 A.L.R. 2d 66 (1976), we concluded that "failure of the withdrawal promise could not frustrate performance of either the entire contract or the optional alternative of performance."

In summary, the appellants' position that the government regulations broadly apply so as to excuse them from all legal obligations which might arise from the lease and the facts is not tenable. Contrary to the appellants' arguments, the purpose of the government regulation is not that of relieving the companies from all their legal obligations.

The purpose of the prohibition against drilling was to protect the potash deposits. It cannot be held to include the release of Phillips and El Paso from their duty to protect the plaintiff-appellee, their assignor, from unlawful drainage of gas.

## II.

■ The next impediment to plaintiff-appellee's recovery urged by appellants is the reasonable prudent operator doctrine. The essence of this rule is that the duty of a contiguous operator lessee or stranger to drill a well in the interest of preventing drainage is limited by the economics of the situation. The principal test is whether a reasonable prudent operator judging on the basis of economic feasibility would drill an offset well. Would it be profitable? The other element of this doctrine is whether substantial drainage has taken place on the leasehold.

In our view the element of substantiality of the drainage is satisfied by the evidence in the case and the court's findings. The trial court's findings numbered 17 and 18 are:

17. The W½ of Section 29 is contributing approximately 26% of the gas contained in the Morrow gas pay zone reservoir for the Mobil Federal # 1 Well.

18. The Mobil Federal # 1 Well located in the E½ of Section 29, is draining gas in substantial quantities from under the W½ of Section 29.

The trial court also specifically concluded that a common lessee has a duty to prevent substantial drainage from the nonproducing lease land regardless of whether or not drilling of an offset well on the nonproducing land would be a prudent operation.

The defendants as common lessees under two separate leases covering the E½ and the W½ of Section 29 are under a duty to plaintiff to protect her interest. The question here is whether the prudent operator rule is to be applied. Appellee contends that it has no applicability in a situation such as that presented where the defendants are common lessees in the W½ (the unused portion of the leased tract) which is contributing approximately 26% of the gas contained in the Morrow gas pay zone reservoir for the Mobil Federal No. 1 Well.

There are various reasons assigned for this exception to the reasonable prudent operator rule. It is sometimes emphasized that the common lessee is not a stranger to the situation and is operating on an arm's length situation; that he is subject to a duty to protect the lessee from the harm. Sometimes it is said that there is an unjust enrichment if the lessees are allowed to convert the gas with impunity. Some cases go so far as to characterize this as fraudulent drainage. The history of this is said to be found in the early cases which were seeking to bring this kind of controversy within equity jurisdiction. *See* 6 Natural Resources Journal, 45 at 54, citing 5 Williams & Meyers Oil & Gas Law, 143; *Kleppner v. Lemon*, 197 Pa. 430, 47 A. 353 (1900); *Adkins v. Huntington Dev. & Gas Co.*, 113 W.Va. 490, 168 S.E. 366 (1933); *Lamp v. Locke*, 89 W.Va. 138, 108 S.E. 889 (1921). The authors also cite two Tenth Circuit cases which suggest the existence of a duty on the part of the lessee to deal fairly with the interest of his lessor. *Phillips Petroleum Co. v. Peterson*, 218 F.2d 926 (10th Cir. 1954); *Boone v. Kerr-McGee Oil Indus.*, 217 F.2d 63 (10th Cir. 1954). Some of the decisions which recognize the implied covenant to protect lessor against drainage and do not limit it by the prudent operator doctrine say that the latter rule, while it may apply to a third person, does not apply to a lessor because of the duty of the lessee to refrain from acts which are injurious to the lessor, while at the same time refusing to imply a duty to drill an offset well to protect lessor's land from drainage by third persons.

*See for example R. R. Bush Oil Co. v. Beverly-Lincoln Land Co.*, 69 Cal.App.2d 246, 158 P.2d 754 (1945). The court in *Bush* followed *Hartman Ranch Co. v. Associated Oil Co.*, 10 Cal.2d 232 at 240, 73 P.2d 1163. It also followed *Geary v. Adams Oil & Gas Co.*, 31 F.Supp. 830 (E.D.Ill.1940). The often-cited language of this case is set forth. The emphasis of the language of the defendant-lessor as the beneficiary of the oil drained from plaintiff's land is that it has not only been saved the cost of drilling and equipping a well, but gets the oil without having to pay for it.

Another case which is frequently cited is that of the Supreme Court of Mississippi, *Millette v. Phillips Petroleum Co.*, 209 Miss. 687, 48 So.2d 344 (1950), which also enforced an implied covenant to protect against the lessee's impairing the value of the lease. It is said that this extends to a duty to drill offset wells if practical and profitable, and to an obligation to refrain from acts which deplete the lands of his lessor and thus impair the value of the property. The right to recover for breach of an implied covenant to protect the lessor is recognized and enforced.

The Mississippi case of *Monsanto Chemical Company v. Andreae*, 245 Miss. 11, 147 So.2d 116 (1962), refused to apply the *Millette* case because the facts did not warrant it.

Perhaps the most significant, although at the same time brief and pointed opinion, is that of the Supreme Court of Texas in *Shell*

*Oil Company v. Stansbury*, 410 S.W.2d 187, 188 (Tex.Civ.App.1966), where the court said:

> We approve the holding that Stansbury was entitled to recover damages from Shell upon proof that Shell caused substantial drainage of the lessor's lands, and that a reasonably prudent operator would have drilled a well on the Stansbury land to protect it from drainage. *Hartman Ranch Co. v. Associated Oil Co.*, 10 Cal.2d 232, 73 P.2d 1163 (1937); Meyers and Williams, Implied Covenants in Oil and Gas Leases; Drainage Caused by the Lessee, 40 Texas L.Rev. 923, 929–940 (1962). We disapprove any language in the opinion of *Hutchins v. Humble Oil & Refining Co.*, 161 S.W.2d 571 (Tex.Civ. App.1942, writ ref. w. o. m.) which conflicts with the principle that a lessee is under a duty to protect his lessor against depletion of the lessor's minerals by the affirmative act of the lessee upon adjacent land.

*Adkins v. Huntington Oil and Gas Company, supra,* is an example of use of the fraud analysis. Here again the contention was that there was no duty to either drill an offset well or compensate for injury to the lessor's property. The judgment of the lower court in the *Adkins* case was modified so as to cancel the lease or, in the alternative, pay a sum of money for damages.

The Supreme Court of Wyoming has also refused to follow the reasonable prudent operator rule in a situation where there was a relationship between the parties. *See Olsen v. Sinclair Oil & Gas Company,* 212 F.Supp. 332 (D.Wyo.1963). The persuasive factor to the Wyoming court was that the lessor Olsen was helpless considering that Sinclair there surrendered the lease. At the time of surrender a substantial percentage of all of the gas structure had been withdrawn. The Olsens could not then with economy have drilled a well of their own. The court thus was persuaded by the duty on the part of the lessee not to drain oil or gas from under his lessor's land. It would appear to be balancing the equities.

The closest that the New Mexico court has come to considering this present question is in *Cone v. Amoco Production Co.,* 87 N.M. 294, 532 P.2d 590 (1975), wherein the problem is discussed and the court acknowledges that many cases reason that the common lessee has a duty to prevent substantial drainage regardless of whether or not drilling of an offset well would be a prudent operation, that is, would produce oil or gas and pay in quantities. The court was not required to determine whether it would apply the reasonable prudent operator rule because the drainage in the *Cone* case was not substantial.[1]

■ We conclude that the trial court was correct in its determination that the reasonable prudent operator limitation was not applicable to this case; that in view of the relationship of the parties there existed an implied covenant running to the plaintiff-appellee to refrain from any action which would deplete her property in the lease. There was a direct violation of this implied covenant. It is unnecessary then to consider whether it has undertones of inequitable conduct or unjust enrichment. The appellant companies have violated an implied covenant to refrain from activities that would injure her property interest.

1. The language found in the *Cone* opinion is as follows:

> Some states have applied what is termed the "prudent operator" rule. *Breaux v. Pan American Petroleum Corporation,* 163 So.2d 406 (Ct.App.La.1964), cert. denied, 246 La. 581, 165 So.2d 481 (1964). Succinctly stated, this rule says that it is the duty of the lessee to prevent substantial drainage of oil or gas from the leased land, when an offset well could be drilled which would produce oil or gas in paying quantities. 5 Williams and Meyers, Oil & Gas Law, § 821 at 78 (1972). On the other hand, other jurisdictions expressly reject the prudent operator rule in this limited factual situation and establish a more liberal rule. *Phillips Petroleum Company v. Millette,* 221 Miss. 1, 72 So.2d 176, 74 So.2d 731 (1954); *R. R. Bush Oil Co. v. Beverly-Lincoln Land Co.,* 69 Cal.App.2d 246, 158 P.2d 754 (1945). According to the reasoning of these cases, a common lessee has a duty to prevent substantial draining of the leased land, regardless of whether or not the drilling of an offset well would be a prudent operation, i. e., produce oil or gas in paying quantities.

Finally, the trial court's determination that the prudent operator rule was inapplicable is not to be lightly disregarded. The trial judge is a veteran state trial judge as well as a veteran federal trial judge. Under such circumstances his projection is entitled to respect.

### III.

The question which is now posed is whether the presence in the lease of an express covenant dealing with the subject of drilling of offset wells precludes the existence or, as the appellants say, negatives the existence of an implied covenant to protect the plaintiff-appellee from drainage.

Having heretofore decided, first, that an implied warranty existed and that it was not negated by a government prohibition against drilling an offset well in the area, and having further concluded that in this context the reasonable prudent operator doctrine did not impede or prevent recovery of damages for drainage, there remains little to decide with respect to the express covenant to drill wells to protect the lease land from drainage.

█ The theory of defendants-appellants is that where there is contained in the lease an express provision dealing with the obligation to drill offset wells that this automatically displaces the implied covenant to protect from drainage or the implied duty to protect the lessor from damage.[2]

Appellants' main reliance is on this court's decision in *Sawyer v. Mid-Continent Petroleum Co.*, 236 F.2d 518 (10th Cir. 1956). However, *Sawyer* did not hold, as appellants would have it, that an express lease provision undertaking to drill offset wells automatically displaces an implied covenant

to protect against drainage. In *Sawyer* there was drainage and a compensatory royalty was paid and subsequently a diagonal offset well was drilled. The subsequent suit was an effort on the part of the lessee to recover the sum of $14,259.10, the compensatory royalty money which the plaintiff had paid allegedly by mistake. It seems that after Mid-Continent had drilled and completed the diagonal offset well the company officers learned of an unusual provision in the Sawyer lease. The opinion describes this as follows:

In February 1951, Mid-Continent drilled and completed the diagonal offset, in lieu of which compensatory royalty had been paid. Shortly thereafter, however, the company officers and responsible agents learned of unusual provisions in the Sawyer lease explicitly exonerating the lessee of the obligation to drill the diagonal offset well and *suspending all implied obligations until a judicial determination thereof.* Mid-Continent thereupon brought this suit for restitution, resulting in the judgment appealed from. (Emphasis supplied.)

236 F.2d at 520.

*Sawyer* is then a peculiar case with unusual facts. The problem in *Sawyer* did not involve displacement of an implied covenant in a lease as a result of the presence of a drilling covenant. Rather, the Sawyer lease explicitly exonerated the lessee of its obligation to drill an offset well and *suspended all implied obligations.*

Other authorities cited by appellants are *Magnolia Petroleum Co. v. Page*, 141 S.W.2d 691 (Tex.Civ.App.1940); *Sunray DX Oil Co. v. Texaco, Inc.*, 417 S.W.2d 424 (Tex. Civ.App.1967). Neither of these purports to deal with our specific issue. They support

---

**2.** Section 2(c) of the lease is as follows:

(c) Wells—1. To drill and produce all wells necessary to protect the leased land from drainage by wells on lands not the property of the lessor, or lands of the United States leased at a lower royalty rate, or as to which the royalties or rentals are paid into different funds than those of this lease, or in lieu of any part of such drilling or production, with consent of the Director of the Geological Sur-

vey, to compensate the Lessor in full each month for the estimated loss of royalty through drainage in the amount determined by such Director; (2) . . .; and (3) promptly after due notice in writing to drill and produce such other wells as the Secretary of Interior may reasonably require in order that the leased premises may be properly and timely developed and produced in accordance with good operating practices.

the general principle of contract law that where a written contract covers a subject nothing may be implied.

Appellants' assumption is that Section 2(c) covers the problem when, in fact, it is somewhat vague in its purposes and doubtful in its coverage. Besides, many cases hold that where it is the lessor whose property is being drained, this doctrine of the positive excluding the implied is not applicable.

Professors Meyers and Williams in their 1962 article in the Texas Law Review describe generally the cases which hold that where the lessee has caused the drainage through his or its operation, the lessor may recover:

Several cases hold that the lessee is liable for breach of duty although a protection well would not produce oil or gas in paying quantities. Under this holding, the operator would appear to be an insurer against permanent loss of oil caused by the lessee's operations. In other cases, the effect is to nullify an express clause of the lease that would, in an ordinary drainage case, bar enforcement of the implied covenant. Thus it has been held that lessor may recover despite a delay rental clause permitting the lessee to pay money in lieu of drilling. Some leases contain express clauses obligating the lessee as a prudent operator to drill a protection well when a draining well is located within a specified distance of the property lines. This clause is usually interpreted to exclude a duty to drill if the draining well is a greater distance away. When the lessee is causing the drainage, however, some cases disregard the express covenant and hold the lessee liable regardless of how far away the draining well may be. Other express clauses limiting the number of wells a lessee must drill have been set aside when the lessee does the draining. Lastly, acceptance of delay rentals with notice of drainage is regarded by many courts as a waiver of the right to enforce the covenant, but has been held not to bar recovery when the lessee is responsible for the drainage.

40 Tex.L.Rev. 926–27. The cases cited by the authors regarding the nullifying of an express clause have already been discussed in Part II above and are in footnote 10 which reads as follows:

*Blair v. Clear Creek Oil & Gas Co.,* 148 Ark. 301, 230 S.W. 286 (1921); *Hartman Ranch Co. v. Associated Oil Co.,* 10 Cal.2d 232, 73 P.2d 1163 (1937); *Bush Oil Co. v. Beverly-Lincoln Land Co., supra ; Millette v. Phillips Petroleum Co.,* 209 Miss. 687, 48 So.2d 344 (1950).

The cases which are said by the authors to disregard the express covenant are *Bush Oil Co. v. Beverly-Lincoln Land Co., supra ; Millette v. Phillips Petroleum Co., supra ; contra Hutchins v. Humble Oil & Ref. Co.,* 161 S.W.2d 571 (Tex.Civ.App.1942).

The authors at pages 928–29, although critical of the doctrine that allows a lessor to recover notwithstanding the existence of an express covenant which supposedly defines his rights, nevertheless acknowledge that where the drainage is caused by the lessee, the implied covenant is recognized and recovery is allowed on it. The authors finally state that they do not condemn the making of distinctions in drainage cases on the basis of who is causing the drainage. Their objection is to the use of the term "fraudulent drainage" in the place of reasonable analysis. The authors recognize that when a lessee is capturing plaintiff's oil from adjoining wells, he might well be considered a wrongdoer even though fraud is too strong a characterization.

In our case there is no serious dispute as to whether the defendants are draining substantial quantities of gas from the plaintiff's former leasehold. Moreover, defendants do not seek to establish that they are not gaining an unfair advantage. Rather, their position is that what they are doing is lawful. In our view, however, the law does not support them in this position. Hence, we must hold that the presence of this positive provision regarding offset wells does not prevent recognition of an implied covenant to protect plaintiff and does not preclude recovery on such a covenant.

## IV.

█ Does the plaintiff as an overriding royalty interest owner have standing to bring an action claiming violation of the implied covenant to protect against drainage?

It is argued without citing any persuasive authority that the plaintiff as the owner of an overriding royalty does not have standing in court to enforce the obligation of the lease and therefore of the implied covenant to protect against drainage. We disagree.

This problem is fully considered by Williams and Meyers in their treatise on oil and gas law. *See* 5 Oil and Gas Law (1975). It is true that there is very little case law on this subject. The authors, however, have collected the authorities and have set forth the general rule as being that a successor in interest to the original lessor may enforce the covenants implied in the lease. This is said to be a matter of traditional land law. The elements which must be satisfied are that the covenant be in writing; the parties intend that the covenant run to the successor; the covenant touches and concerns the land; and the parties are in privity of estate.

The requirement of writing is satisfied because the covenants are implied in a written instrument. The intent requirement is satisfied in the typical lease which provides for assignment by either party and for the covenants to be binding on heirs, executors, administrators, successors, or assigns. The authors also explain that the privity of estate as well as the touch and concern requirements are both fulfilled in this kind of lease.

The underlying rationale for the right of the royalty interest owner to enforce the implied covenant is that the covenants run with the land. Hence, even a transferee of a nonparticipating royalty interest or non-executive mineral interest is said to have the same right. In our case, of course, the plaintiff is the successor to the original lessor who upon transfer retained an overriding royalty interest.

The authors also call attention to the cases of *Warren v. Amerada Petroleum Corp.*, 211 S.W.2d 314 (Tex.Civ.App.1948), and *Compton v. Fisher-McCall*, 298 Mich. 648, 299 N.W. 750 (1941). These are not directly in point, but they lend some support to the conclusion that the plaintiff here has standing. In *Warren*, the court stated that the plaintiff, a holder of a non-participating royalty interest, had the same right as the lessor to enforce implied covenants in a lease pertaining to mineral rights. In *Compton*, the court held that the lessor-plaintiff had not failed to join a proper party by failing to join a postlease transferee of a nonparticipating royalty interest. In stating that the implied covenants of the lease were divisible, the court implied that the royalty interest holder could bring its own action.

There is somewhat of a dearth of case authority on denying the right of a royalty interest owner to bring such an action.

Also to be noted is that in the case at bar the plaintiff is in a very difficult position due to the fact that the lessor has no incentive to bring an enforcement action because the United States, the lessor, is collecting its royalty both from the E½ of Section 29 and from the W½ as well. Since the United States is not being deprived of anything, the only thing remaining is for the plaintiff to bring the action herself. It is impossible to say that she lacks standing or interest to bring the action since she is the *only* one who has a pecuniary interest which is affected.

The judgment of the district court is affirmed.